Anna M. D'AMICO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

United Electrical, Radio and Machine Workers of America, Intervenor.

No. 77–2091.

United States Court of Appeals, Third Circuit.

Argued April 27, 1978.

Decided Aug. 24, 1978.

---

2. C. Wright, Federal Courts 195 (3d ed.), citing *Norton v. Cass County*, 115 F.2d 884 (5th Cir. 1941).

Perry F. DiCola, Pittsburgh, Pa., for petitioner.

Robert Z. Lewis, Frank J. Donner, Leonard D. Polletta, New York City, for intervenor.

Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Joseph P. Norelli, N.L.R.B., Washington, D. C., for respondent.

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and STERN, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

This petition of Anna M. D'Amico (petitioner) to review a decision and order of the National Labor Relations Board (Board), 230 N.L.R.B. No. 59 (June 23, 1977), raises an important issue as to the validity of a clause in a collective bargaining agreement granting, *inter alia,* a union recording secretary superseniority in case of layoffs.

The undisputed facts may be summarized. Limpco Manufacturing, Inc. (the Company) employs about 38 employees at the three separately operated divisions of its union shop. Its employees are represented by United Electrical, Radio and Machine Workers of America, Local 623 (the Union). The collective bargaining agreement between the Company and the Union provides in pertinent part (Article XI, Section 5):

> The highest seniority preference will be given to Officers and Union Stewards in regard to layoffs provided they are [cap]able of performing the available work in their work unit. ·

The Union's Constitution and By-Laws provide, *inter alia,* for a Recording Secretary. The Union's Recording Secretary, Patricia Jenkins (Jenkins), was the only officer employed by the Company during the period here involved. The Union also utilized a chief steward and three shop stewards who were employees at the three divisions of the Company. Two stewards worked in the same division as the petitioner and Jenkins.

On July 3, 1975, petitioner was laid off by the Company for economic reasons. Petitioner had greater seniority than Jenkins and admittedly would have been retained and Jenkins laid off except for the quoted provision of the collective bargaining agreement.

The General Counsel for the National Labor Relations Board filed a complaint with the Board against the Union claiming that petitioner's layoff constituted an unfair labor practice. After a hearing, the Administrative Law Judge (ALJ) found that the Union was guilty of an unfair labor practice, contrary to § 8(b)(1)(A) and (2) of the Labor-Management Relations Act, by invoking its superseniority clause to deprive petitioner of her job and causing the Company to violate § 8(a)(3).

By a vote of 3 to 2 the Board reversed the determination of the ALJ and ordered the General Counsel's complaint dismissed. Petitioner now seeks review of that action pursuant to § 10(f) of the Act as amended. 29 U.S.C. § 160(f).

Petitioner asserts that the Union violated § 8(b)(1)(A) and (2) of the Act (29 U.S.C. § 158(b) 1 and 2) which provide in pertinent part:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 [1] of this title . . .;
>
> (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) [2] of this section or to discriminate against an employee with respect to whom mem-

---

* The Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1. Section 157 gives employees the right of self-organization, etc.

2. With certain exceptions not here relevant, subsection (a)(3) makes it an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

bership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership. . . .

Any understanding of the impact of the quoted sections on the validity of the super-seniority clause must commence with the following language of the Supreme Court in *Radio Officers Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954):

But the scope of the phrase "membership in labor organization" is in issue here. Subject to limitations, we have held that phrase to include discrimination to discourage participation in union activities as well as to discourage adhesion to union membership.

Similar principles govern the interpretation of union membership where encouragement is alleged. The policy of the Act is to insulate employees' jobs from their organizational rights. Thus §§ 8(a)(3) and 8(b)(2) were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood.

*Id.* at 39–40, 74 S.Ct. at 335 (footnotes omitted). The Supreme Court went on:

This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concern about "free riders," *i. e.,* employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. Thus an employer can discharge an employee for nonmembership in a union if the employer has entered a union security contract valid under the Act with such union, and if the other requirements of

the proviso are met. No other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned.

*Id.* at 41–42, 74 S.Ct. at 336 (footnotes omitted).

Given the Supreme Court's construction of § 8 of the Act in *Radio Officers,* it is clear to us, and the Board and the Union do not deny, that the superseniority provision for union officers breaches the neutrality mandated by the statute by tying the very substantial benefit of job retention to a particular type of membership in good standing—union activism to the extent of seeking to be elected a union officer. The ALJ ruled that a superseniority clause in favor of union officers, though limited to layoffs, was presumptively invalid under the statute and that the burden was on the Union to justify its use. The ALJ found that the Union had not discharged that burden.

The ALJ's approach was rejected by the Board majority which determined that the Union's only burden was to show that the recipient of the superseniority status (Jenkins) "qualified for the benefit by reason of her role in the overall administration of the collective-bargaining agreement." 230 N.L.R.B. No. 59, at 8 (June 23, 1977). In the Board's view the "General Counsel continues to have the burden of proving affirmatively that the application of a superseniority provision to a functional union officer in a layoff situation is invalid." *Id.*

The Board decided that the Union had discharged its burden in fact but that the General Counsel had not sustained its affirmative burden. It therefore dismissed the petition.

Some background discussion is important to an understanding of the issue here presented. As previously noted, the Supreme Court decided in *Radio Officers Union v. NLRB* that § 8 required neutrality, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The scope of that principle concerned the Board in *Dairylea Cooperative, Inc.,* 219 N.L.R.B. No. 656 (1975), *enforced sub nom. NLRB v. Milk Drivers & Dairy*

*Employees,* 531 F.2d 1162 (2d Cir. 1976). In *Dairylea* the Board decided that a steward superseniority provision limited to layoff and recall was proper.[3] Its reasoning was that:

> The lawfulness of such restricted superseniority is, however, based on the ground that it furthers the effective administration of bargaining agreements on the plant level by encouraging the continued presence of the steward on the job. It thereby not only serves a legitimate statutory purpose but also redounds in its effects to the benefit of all unit employees. Thus, superseniority for layoff and recall has a proper aim and such discrimination as it may create is simply an incidental side effect of a more general benefit accorded all employees.

219 N.L.R.B. at 658 (footnote omitted).

The Board majority states in this case that the facts of *Dairylea* required the Board in *Dairylea* to give only a plant level justification for a superseniority layoff and recall provision as to stewards, *i. e.,* grievance processing. However, the Board states that here the justification for officer layoff superseniority is broader and embraces "the effective and efficient representation of employees by their collective-bargaining representatives." This function, it says, extends beyond the narrow confines of grievance processing.

As we read its decision, the Board is saying that a particular rationale, *i. e.,* grievance processing, was sufficient to dispose of the steward superseniority issue in *Dairylea,* but that such rationale is not an exclusive formulation of possible grounds for a permissible variance from § 8 neutrality. It then proceeds to adopt a broader formula to sustain the validity of an officer layoff superseniority provision, *i. e.,* effective and efficient representation of employees by their collective bargaining representative.

We first confront petitioner's contention that, given the Supreme Court's reading of § 8 in *Radio Officers,* it was legally impermissible for the Board to recognize any deviation from the neutrality mandated by § 8. Thus petitioner says *Dairylea* and its progeny were wrongly decided by the Board.

■ We think § 8 of the Act should be read in conjunction with § 7, which provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

■ Thus, the right of employees to engage in collective bargaining is an integral part of the Act. We believe, therefore, that a collective bargaining provision which furthers that right should be accommodated in the present context unless § 8 constitutes an absolute barrier. In discussing the validity of a superseniority provision in the context of a statute providing for veterans' seniority, the Supreme Court said in *Aeronautical Industrial District Lodge v. Campbell,* 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949):

> One of the safeguards insisted upon by the unions for the effective functioning of collective bargaining is continuity in office for its shop stewards or union chairmen. To that end provision is made, as it was made here, against laying them off merely on the basis of temporal se-

---

**3.** The Board also determined that a steward superseniority provision extending to situations beyond layoff and recall was presumptively invalid. 219 N.L.R.B. 656, 658 (1975). However, in the enforcement proceedings in the Second Circuit Court of Appeals, the steward layoff and recall aspect of the superseniority provision was not in issue. Nor was any application of a superseniority clause to union officers involved.

niority. Because they are union chairmen they are not regarded as merely individual members of the union; they are in a special position in relation to collective bargaining for the benefit of the whole union. To retain them as such is not an encroachment on the seniority system but a due regard of union interests which embrace the system of seniority rights.

*Id.* at 527, 69 S.Ct. at 1290. The Court went on:

A labor agreement is a code for the government of an industrial enterprise and, like all government, ultimately depends for its effectiveness on the quality of enforcement of its code. Because a labor agreement assumes the proper adjustment of grievances at their source, the union chairmen play a very important role in the whole process of collective bargaining. Therefore it is deemed highly desirable that union chairmen have the authority and skill which are derived from continuity in office. A provision for the retention of union chairmen beyond the routine requirements of seniority is not at all uncommon and surely ought not to be deemed arbitrary or discriminatory.

*Id.* at 528, 69 S.Ct. at 1290 (footnote omitted).

█ It is evident from the quoted language that the true rationale for validating a superseniority provision is found in the important function served by the recipient of superseniority in providing continuity of representation in carrying out the objectives of a collective bargaining agreement. Thus, those who, like union stewards, assist in resolving grievances on-the-spot are in a special way fulfilling an essential purpose of collective bargaining, *i. e.*, adjusting grievances at their source.

█ Given the objectives of §§ 7 and 8 of the Act, we are satisfied that a superseniority provision in a collective bargaining agreement is not necessarily impermissible under § 8. Rather we think an accommodation is permissible when a proper justification for according superseniority appears. See *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

We consider then whether record justification was shown for the application of the superseniority provision for the benefit of the recording secretary.

█ Given the strong neutrality policy of § 8, we think that under *Great Dane Trailers* the burden should be on the Union to justify the application of the provision to a recording secretary whose official duties in no way involved her in the collective bargaining process. Although the Board said that it would not presume that officers were not as involved as stewards in the administration of collective bargaining agreements, it nevertheless proceeded to place an initial burden on the Union to show that the official responsibilities of the Recording Secretary bore a direct relationship to the effective and efficient representation of the unit employees in implementing the collective bargaining agreement.

█ Was the Board's formulation of the Union's burden legally sufficient? While the Board speaks of "official responsibilities" rather than "official duties," we are satisfied that the burden imposed fairly fulfills the requirement that a substantial justification be shown by the Union in the first instance. Furthermore, we read the Board decision as requiring the Union to show that the Recording Secretary, as part of her official responsibilities and not merely as a volunteer, performed services which directly assisted in implementing the collective bargaining agreement. We take this to mean that the Union was obligated to produce credible proof that the individual in question was officially assigned duties which helped to implement the collective bargaining agreement in a meaningful way. Any less rigid interpretation of the Board's ruling would leave substantial room to dilute the statutory neutrality principle without the requisite collective bargaining justification.

We turn now to the unchallenged evidence relied upon by the Board to support its conclusion that the Union discharged its initial burden:

The record discloses that Jenkins, as recording secretary, was a member of the executive board and received $15 a month for her duties. She was the highest ranking union officer employed at Limpco. Jenkins was primarily responsible for maintaining records of membership and executive board meetings, presenting Limpco shop reports at those meetings when the chief steward was absent and handling all correspondence for Local 623. Jenkins, as well as the chief steward, posted notices of membership meetings, procured material needed by stewards, and aided stewards in obtaining reimbursement for their lost time on the job due to their union duties. Although the recording secretary had no official duties for handling grievances or participating on the bargaining committee, Local 623's president testified that Jenkins participated informally in processing grievances and assisting stewards in writing grievances, advised stewards and foremen on contract interpretation, and handled problems in general. Jenkins testified that she was asked by the chief steward to attend shop meetings to help formulate bargaining ideas, and that during a recent strike the executive board placed her in charge of scheduling pickets and handling money for pickets. The record indicates that if the recording secretary were laid off and subsequently worked for an employer who was not a party to the collective-bargaining agreement the recording secretary would be required to resign from her office.

230 N.L.R.B. No. 59, at 8–9 (June 23, 1977) (footnote omitted).

■ We think it is clear, indeed it is not challenged, that the official duties explicitly assigned the Recording Secretary in the Constitution and By-laws [4] did not constitute justification for applying the superseniority provision. We ask then whether her official responsibilities justified the Board in finding sufficient justification. Preliminarily, we think the Board was entitled to infer that the activities performed by the recording secretary were performed either as part of her express or implied official responsibilities. Did such activities possess the requisite substantiality?

■ Concededly the Recording Secretary's activities could be described as a mixed bag, but we think several of them qualify as activity furthering the collective bargaining interests of the bargaining unit. For example, Jenkins participated informally in processing grievances and assisting stewards in resolving grievances, and advised stewards and foremen on contract interpretation. She was asked by the chief steward to attend meetings to help formulate bargaining ideas. During a recent strike she was in charge of scheduling pickets and handling money for the pickets.

We think the unchallenged examples were sufficiently substantial to justify the Board's conclusion that the Union sustained the initial burden placed on it. The petitioner does not suggest that she in fact overcame the Union's initial showing. We therefore conclude that on the record as a whole the Board's findings are supported by substantial evidence.

The petition for review will be denied.

4. E. Duties of Recording Secretary: The recording Secretary shall keep all records of the meetings of the Local Union and the Local Executive Board. Conduct all official correspondence of the Local Union and Executive Board and perform such other duties as directed by the Executive Board necessary for the proper and effective administration of the affairs of the Union. He shall be paid a salary of $15.00 per month.