**LOCAL 1384, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 1384, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 826, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO AND CLC, Respondent.**

Nos. 83–2900, 83–3153 and 84–1170.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1984.

Decided Feb. 25, 1985.

Swygert, Senior Circuit Judge, dissented and filed an opinion.

Leonard Page, UAW Legal Dept., Detroit, Mich., for Local 1384, petitioner.

James G. Mauro, Jr., Assoc. Gen. Counsel, Local 826, Washington, D.C., for Local 826, respondent.

Kathleen Murray, Elliott Moore, Washington, D.C., for N.L.R.B.

Before WOOD and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

In these consolidated petitions[1] we are asked to decide whether a rule recently adopted by the National Labor Relations Board governing grants of superseniority to union officers is rational and consistent with the National Labor Relations Act, and also in one case (No. 83–2900), whether the rule was properly applied to the facts. The rule in question is that of *Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406 (1983), *enforced sub nom. Local 900, IUE v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984), declaring lawful only superseniority provisions for officials who must be on the job in order to accomplish their duties directly related to administering the collective bargaining agreement. We enforce the orders of the Board.

## I

A. Nos. 83–2900 and 83–3153 (*Ex-Cell-O*)

In April 1980 Nora Becky Smith was elected recording secretary of Local 1384 of the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), the collective bargaining representative for the production and maintenance employees at the Elwood, Indiana, plant of Ex-Cell-O Corporation. Exercising a superseniority provision of the collective bargaining agreement, the union secured her transfer from the midnight shift to the day shift.[2] Because of this transfer Emma Hartley, an employee with more seniority than Smith, was transferred to the afternoon shift against her wishes.[3] Hartley filed an unfair labor practice charge with the Board, protesting her transfer.

On July 28, 1980, the Board's General Counsel issued a complaint against Local 1384, alleging that the union's maintenance and enforcement of the superseniority provision unlawfully caused the employer to discriminate against its employees on the basis of their union activity, in violation of

1. No. 83–2900 and No. 83–3153, separate appeals in the same case, were consolidated by our order of January 20, 1984. No. 84–1170 was consolidated with those appeals by our order of June 19, 1984.

2. The provision reads, in relevant part: "[T]he ... Recording Secretary will be assigned to the day shift." Collective Bargaining Agreement § 4(a) (1978). It was added to the collective bargaining agreement in 1978 to remedy a problem the union had encountered. During the previous term of the contract the president and the recording secretary worked different shifts. This situation made it difficult for the president to communicate with the recording secretary and resulted, among other things, in missed deadlines for the posting of notices for strike votes and union officer elections. The union president began relying on the financial secretary, who worked on his shift, to perform the recording secretary's duties in addition to her own.

3. Choice of shift is a perquisite of seniority. Smith did not have enough seniority to transfer to the day shift without the superseniority provision. Ordinarily if a surplus results when an employee chooses to transfer to a certain shift, a less senior employee must be transferred out of that shift. In this case, however, a more senior employee was transferred out.

§ 8(b)(1)(A) and § 8(b)(2) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(b)(1)(A), (b)(2).

A hearing on the complaint was held before an administrative law judge ("ALJ") on February 17, 1981. On a basically undisputed factual record the ALJ found that the duties of the recording secretary [4] made it desirable that she be assigned to the day shift, in order to have ready access to the president and other collective bargaining officials who were on that shift. He found that when two officers are on different shifts, communications breakdowns can and have occurred, with results harmful to the functioning of the union. He concluded that the shift assignment provision in question bore a sufficiently direct relationship to the effective and efficient representation of the local as to render it lawful under *United Electrical, Radio and Machine Workers Local 623*, 230 N.L.R.B. 406 (1977) *(Limpco Manufacturing, Inc.), petition for review denied sub nom. D'Amico v. NLRB*, 582 F.2d 820 (3d Cir.1978). He accordingly dismissed the complaint.

The General Counsel filed exceptions, and on September 30, 1983, the Board rendered its decision. *Local 1384, UAW*, 267 N.L.R.B. 1303 (1983). Without disputing the factual findings of the ALJ, the Board pointed out that it had since overruled *Limpco* in *Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406 (1983), *enforced sub nom. Local 900, IUE v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984). Under the standard of *Gulton* a union officer may not be granted superseniority unless the officer's position requires an on-the-job presence at specific times in order to ensure the enforcement of the collective bargaining agreement and the prompt processing of grievances. The Board concluded that the recording secretary's functions do not meet that criterion. The Board conceded that the shift assignment provision in question would make the union's operations more efficient and effective but stated that it was not in the business of promoting such concerns at the expense of rights assured by § 7 of the Act. Accordingly, the Board, reversing the ALJ, held that by maintaining and enforcing the superseniority provision for the recording secretary the union had violated § 8(b)(1)(A) and § 8(b)(2) of the Act.

The union petitions us to set aside the Board's ruling (No. 83–2900), and the Board cross-petitions for enforcement (No. 83–3153).

### B. No. 84–1170 *(Otis Elevator)*

From February 1980 through June 1981 David Carter, a production clerk, was the financial secretary-treasurer of Local 826 of the International Union of Electrical, Radio and Machine Workers, the collective bargaining representative of the production and maintenance and plant clerical workers at the Bloomington, Indiana, facility of the Otis Elevator Company. Under a superseniority provision of the collective bar-

**4.** The duties of the recording secretary are set forth in the UAW constitution as follows:

It shall be the duty of the Recording Secretary to keep a correct record of the proceedings of the Local Union, sign all orders on the treasury authorized by the Local Union, read all documents and conduct the general correspondence received by the Local Union which does not pertain directly to the duties of the other officers of the Local Union, and keep same on file for future reference. He shall bring to the attention of the membership of the Local Union any correspondence upon which the membership must take action. He shall comply with the provision of Article 50, Section 2. He shall furnish to the Research Department of the UAW and to his Regional

Director, every six (6) months (in January and July): (1) Three (3) copies of the existing contract(s); (2) A complete revised list of all classifications and rates for the plant or plants covered by the contract(s); (3) Any additional information gained through negotiations with the respective plant management that may be useful to other Local Unions in their collective bargaining.

Additionally, the constitution designates the recording secretary as the union officer to whom appeals from actions of the Local are to be submitted, and as the officer who must send strike notices to all union members. She also must prepare a statement of unresolved contract issues to be submitted to the International Union in the course of contract negotiations.

gaining agreement, union officers were accorded a preference for layoff and recall.[5]

In the late summer of 1980, Otis reduced its work force. Linda L. Fields, a production clerk with more seniority than Carter, was transferred to a lower paying job as inventory clerk. Without the superseniority provision, Carter would have been transferred instead of Fields.[6]

On September 10, 1980, Fields filed an unfair labor practice charge with the Board. The Board issued a complaint charging Local 826 with violations of § 8(b)(1)(A) and § 8(b)(2) of the Act. A hearing was held before an ALJ on July 8, 1981. The ALJ found that the financial secretary-treasurer, though not engaged in steward-type functions at the plant level, was nevertheless vital to the proper and efficient functioning of the union. Applying *Limpco* as governing law, the ALJ concluded that the union did not violate the Act and dismissed the complaint. The General Counsel filed exceptions, the union filed cross-exceptions, and on October 27, 1983, the Board rendered its decision. *Local 826, IUE*, 268 N.L.R.B. No. 12, 1983–84 NLRB Dec. (CCH) ¶ 15,973 (1983). The Board found the facts to be undisputed, affirmed the ALJ's finding that the financial secretary-treasurer does not engage in steward-type functions at the plant level, and, applying *Gulton,* concluded that the union had indeed violated § 8(b)(1)(A) and § 8(b)(2) of the Act by according Carter superseniority as financial secretary-treasurer and causing Fields to be displaced rather than him.

The Board now applies to this court for enforcement of its order.

## II

### A. The Standard of Review

The unions claim that the Board's decisions are erroneous because the rule of *Gulton* is an inappropriate standard for judging the lawfulness of superseniority provisions. They contend that the rule of *Limpco* is appropriate and should govern these cases. In addition, the union in *Ex-Cell-O* contends that the Board misapplied the *Gulton* rule to the facts, and the union in *Otis Elevator* contends that it waived (and had the power to waive) the employee right that the Board seeks to vindicate.

█ Our review of a decision of the National Labor Relations Board is narrow. Congress has given the Board authority to develop and apply fundamental national labor policy, including the authority to formulate rules to fill the interstices of the broad provisions of the labor statutes. *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500–01, 98 S.Ct. 2463, 2473–74, 57 L.Ed.2d 370 (1978). Where the problem requires the balancing of legitimate conflicting interests, the function of striking that balance to effectuate national labor policy, often a difficult and delicate responsibility, has been committed by Congress primarily to the Board, subject to limited judicial review. *NLRB v. Truck Drivers Local 449, International Brotherhood of Teamsters*, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). The rule that the Board adopts is judicially reviewable for consistency with the Act and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced. *Beth Israel*, 437 U.S. at 501, 98 S.Ct. at 2473 (citing *NLRB*

---

5. The provision reads as follows:
   Notwithstanding the other provisions of this Article, in the event that there should be a decrease in the working force, the Local Union Officers, including negotiation committee members, shall be the last to be laid off and the first to be recalled provided that they have the ability and fitness to perform the available work.
   Salaried Employees Agreement art. IV § 8 (1980).

6. Under the layoff procedure in the collective bargaining agreement, an employee removed from an occupation in which there is a surplus displaces a less senior employee in an occupation of the same or lower level, the process continuing until the displacements reach the lowest level. Salaried Employees Agreement art. IV § 5 (1980).

*v. Erie Resistor Corp.,* 373 U.S. 221, 235–36, 83 S.Ct. 1139, 1149–50, 10 L.Ed.2d 308 (1963); *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941)).

Our analysis proceeds as follows. We first review the relevant statutes and the policies underlying them, as interpreted by the Supreme Court. We next briefly recount the history of the issue of superseniority for union officers before the Board. We proceed finally to the evaluation of the arguments put forward by the unions to persuade us to deny enforcement of the Board's orders.

### B. Statutes and Policies

Section 7 of the Act gives employees the right to participate in labor organizations and to bargain collectively, and also the right to refrain from such activity. 29 U.S.C. § 157.[7] It is the policy of the Act to bar both employers and unions from restraining or coercing employees in the exercise of their § 7 rights, and the Act makes such activities unfair labor practices. § 8(a)(1) (employers), (b)(1)(A) (labor organizations), 29 U.S.C. § 158(a)(1), (b)(1)(A). In further protection of the employees' § 7 rights, the Act makes it an unfair labor practice for an employer to encourage or discourage membership in a labor organization by discrimination in regard to hire or tenure of employment or any term or condition of employment, § 8(a)(3), 29 U.S.C. § 158(a)(3), and for a union to cause or

attempt to cause an employer so to discriminate. § 8(b)(2), 29 U.S.C. § 158(b)(2).[8]

These § 8 provisions serve to insulate employees' jobs from their organizational rights under § 7. *Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954). They were designed "to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." *Id.* "Membership," as used in § 8(a)(3), includes not only enrollment in the union but also participation in union activities. *Id.* Thus if an employer discharges a nettlesome union activist, he may be guilty of an unfair labor practice under § 8(a)(3). If at the behest of the incumbent union he provides some job-related benefit, such as longer paid vacations, to union officers, both he and the union may be guilty of an unfair labor practice under § 8(a)(3) and § 8(b)(2).

We say that such actions *may,* rather than *would,* be unfair labor practices, because improper motivation is additionally required. *See Radio Officers' Union v. NLRB,* 347 U.S. 17, 42–44, 74 S.Ct. 323, 336–337, 98 L.Ed. 455 (1954). There is no unfair labor practice unless the action is taken because of the union activities of the employees directly affected, with intent to encourage or discourage union membership. *Id.* Improper intent need not be separately proved, however, when such en-

---

**7.** Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
  29 U.S.C. § 157.

**8.** (a) It shall be an unfair practice for an employer—
  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .
  (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
. . . .
29 U.S.C. § 158(a)(1), (a)(3).
  (b) It shall be an unfair labor practice for a labor organization or its agents—
  (1) to restrain or coerce (A) employees in the exercise of rights guaranteed in section 157 of this title . . . .
  (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section . . . .
29 U.S.C. § 158(b)(1)(A), (b)(2).

couragement or discouragement is a natural consequence of the discriminatory action. *Id.* 347 U.S. at 45, 74 S.Ct. at 338. In *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Supreme Court divided discriminatory conduct into two categories: (1) conduct so inherently destructive of employee interests that it may be deemed proscribed without need for proof of an underlying improper motive, and (2) conduct of which the harm to employee interests is comparatively slight. *Id.* at 33–34, 87 S.Ct. at 1797–1798. In the former case the burden is on the employer to prove that his action was actually motivated by legitimate and substantial business justifications. In the latter case the employer has the burden of coming forward with evidence of legitimate and substantial business justifications, whereupon the burden shifts to the General Counsel to prove an anti-union motivation. *Id.* Where union action is challenged under § 8(b)(2), we think that the same analysis would apply, except that the union, rather than the employer, would have the burden of showing legitimate and substantial business justifications. "Business justifications," when applied to a labor union, would evidently refer to reasons relating to the advancement of the union's "business" of acquiring and retaining recognition as bargaining representative, representing employees in the negotiation and administration of collective bargaining agreements, and conducting its own internal affairs.

## C. Superseniority for Union Officers: History Before the Board

Collective bargaining agreements commonly allocate certain employee benefits, such as choice of shift, priority for overtime work, or precedence in layoffs and recalls, to employees on the basis of their seniority. A "superseniority" provision is one that assigns to certain union members a seniority greater than their "natural" seniority for the purpose of making them specially eligible for certain seniority-linked benefits, or which grants them such benefits directly, regardless of their natural seniority. Superseniority provisions are suspect under the National Labor Relations Act because they are inherently discriminatory in a way that arguably tends to encourage enrollment and active participation in the union. When such encouragement is the sole purpose of the provision, there is no question that it violates the Act. *See Radio Officers' Union v. NLRB*, 347 U.S. 17, 42–44, 74 S.Ct. 323, 336–337, 98 L.Ed. 455 (1954). But the Board and the courts have long recognized that superseniority provisions may sometimes serve a legitimate purpose that overrides any tendency they may have to encourage union participation. *See, e.g., Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656 (1975) (well established that steward superseniority limited to layoff and recall is proper), *enforced sub nom. NLRB v. Milk Drivers Local 338*, 531 F.2d 1162 (2d Cir.1976). Formulating rules that draw the line between lawful and unlawful superseniority provisions is a task that has given the Board some difficulty, especially with respect to union officers. The cases we review today arise out of the Board's most recent attempt to draw the line in *Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406 (1983), *enforced sub nom. Local 900, IUE v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984).[9]

**9.** The Supreme Court has spoken only once on the subject of superseniority for union officials, and then not in the context of the federal labor laws, in *Aeronautical Indus. Dist. Lodge 727 v. Campbell*, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949). The Court approved a contract provision giving union chairmen (i.e., stewards) top seniority, against a challenge that it violated a requirement of the Selective Service Act that veterans be restored to their former positions without loss of seniority. Because the Court did not consider the lawfulness of the contract provision under the federal labor laws, we do not find it to be authority relevant to the issues in the instant cases. Members of the Board favoring both highly expansive and highly restrictive views of the lawfulness of superseniority for union officials have found support for their views in *Campbell. Compare Dairylea Cooperative Inc.*, 219 N.L.R.B. 656, 622–63 (1975) (Member Fanning, dissenting), *enforced sub nom. NLRB v. Milk Drivers Local 338*, 531 F.2d 1162 (2d Cir.1976), *with Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406, 408 n. 11 (1983), *enforced sub*

The Board first treated the lawfulness of superseniority provisions in *Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656 (1975), *enforced sub nom. NLRB v. Milk Drivers Local 338*, 531 F.2d 1162 (2d Cir.1976). The Dairylea collective bargaining agreement contained a provision making each union steward the senior employee in his craft for all seniority-linked contractual benefits, including preference in layoff and recall, assignment of overtime, job assignment, and choice of vacation period, shift, hours, and day off. The Board held that steward superseniority in layoff and recall is lawful because it furthers the effective administration of bargaining agreements on the plant level by encouraging the continued presence of the steward on the job. *Id.* at 658. This function, according to the Board, redounds to the benefit of all unit employees, and such discrimination as it may create is simply an incidental side effect of that more general benefit. *Id.* But the Board found no evidence that superseniority for stewards going beyond layoff and recall serves any purpose other than the impermissible one of giving union stewards special economic or other on-the-job benefits solely because of their position in the union. *Id.* The Board held accordingly that superseniority clauses that are not on their face limited to layoff and recall are presumptively unlawful, with the burden of rebutting the presumption (i.e., establishing justification) resting on the party asserting their lawfulness. *Id.*

The Board addressed the question of the lawfulness of superseniority provisions benefiting union officers in *United Electrical, Radio and Machine Workers of America, Local 623*, 230 N.L.R.B. 406 (1977) *(Limpco Manufacturing, Inc.), petition for review denied sub nom. D'Amico v. NLRB*, 582 F.2d 820 (3d Cir.1978), and found itself deeply divided. The collective bargaining agreement provided a prefer-

ence for layoff and recall for the union's recording secretary, who performed no steward-type functions. *Dairylea* had declared such preferences lawful for stewards, and the issue the Board faced was whether they were also lawful for union officers or whether they fell within the scope of *Dairylea's* rebuttable presumption of invalidity. An aggregate majority of the Board, with two members dissenting, held that the superseniority provision in question was lawful. According to the Board, *Dairylea* was not intended to circumscribe which union representatives could be recipients of superseniority but rather to articulate the appropriate objectives of superseniority provisions, in the light of the legitimate statutory purpose of facilitating the effective administration of the collective bargaining agreement on the plant level. *Id.* at 407. Union officers, according to the Board, could be just as involved as stewards in the administration of the collective bargaining agreement, without performing steward-type duties. *Id.* at 408. Once it has been demonstrated that the official responsibilities of the union officer in question bear a direct relationship to the effective and efficient representation of unit employees, the Board held, the officer is entitled to the benefit of the same presumption afforded to union stewards.[10] *Id.* Finding that this test was met in the case of the union's recording secretary, the Board dismissed the complaint. *Id.*

The dissenters took a rather different view of *Dairylea*. According to them, the objective of superseniority provisions legitimated by the Board in *Dairylea* was not the effective and efficient representation of unit employees in general, but only the effective administration of bargaining agreements on the plant level, i.e., the processing of grievances and the enforcement of the collective bargaining agreement *on*

---

*nom. Local 900, IUE v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984).

**10.** The Board's reasoning included an unexplained transition from "the effective administration of the collective-bargaining agreement

on the plant level" to "the effective and efficient representation of employees by their collective bargaining representatives," seemingly a much more inclusive standard. *See Limpco*, 230 N.L.R.B. at 407.

*the job. Id.* at 409. Only thus, they said, is the discriminatory effect of superseniority balanced by benefits to all employees; the Board's broader standard tips the balance against individual employee rights by tying job benefits to political activism in the union. *Id.* The dissenters would have held presumptively valid only those superseniority provisions which enable union officials with on-the-job grievance adjustment responsibilities to remain on the job in order to carry out those responsibilities.[11]

In a major change of course, a unanimous Board of different composition[12] decided in 1983 to overrule *Limpco* and its progeny and adopt the general view of the *Limpco* dissent. *Gulton Electro-Voice, Inc.,* 266 N.L.R.B. 406 (1983), *enforced sub nom. Local 900, IUE v. NLRB,* 727 F.2d 1184 (D.C.Cir.1984). In *Gulton* the union's recording secretary and financial secretary-treasurer were accorded superseniority with respect to layoff and recall. The Board found these preferences to be unlawful, on the ground that those officers had no responsibility for grievance processing and on-the-job contract administration. The Board found, as it had found in *Dairylea,* that stewards have a need to maintain an on-the-job presence in order to carry out their duties, and that job retention superseniority is therefore justified for them, despite the fact that it discriminates on the basis of union-related activities. *Id.* at 408. But the Board departed from *Dairylea* at the next step: it declared all other grants of superseniority to be unlawful. *Dairylea* was more tentative; grants of superseniority not in the service of steward-like duties on the plant level were presumptively unlawful, but the presumption could be overcome by proof of justification. Under *Gulton* no other justification is allowed:

> We will find unlawful those grants of superseniority extending beyond those employees responsible for grievance pro-

cessing and on-the-job contract administration. We will find lawful only those superseniority provisions limited to employees who, as agents of the union, must be on the job to accomplish their duties directly related to administering the collective-bargaining agreement.

266 N.L.R.B. at 409.

Elaborating on the case of union officers, the Board stated that job retention superseniority is unnecessary for them, because they can continue to perform their union duties when laid off. *Id.* According to the Board, even if an officer must be replaced because of a layoff, changes in union officers are not so disruptive to unit representation as to warrant a blanket grant of superseniority. *Id.* The Board noted that there had been no showing in any case involving superseniority for union officers that unions would be crippled in their ability to administer collective bargaining agreements without the benefit of officer superseniority. *Id.*

The Board has since applied the principles of *Gulton* in *Niagara Machine & Tool Works,* 267 N.L.R.B. 661 (1983), *enforced,* 746 F.2d 143 (2d Cir.1984), striking down a layoff preference for certain officers who were members of the union's executive board but who had no duties requiring their presence in the plant.

### D. The Unions' Arguments

#### 1. Arguments Against the Rule in *Gulton*

The union in *Ex-Cell-O* argues that the sole justification for superseniority countenanced in *Gulton* is excessively narrow. In fact, the union contends, superseniority for a union officer is proper where it has at most a slight impact on individual employee rights and serves the substantial legitimate purpose of promoting effective and effi-

---

**11.** The division of opinion on the Board was further illustrated in *American Can Co.,* 244 N.L.R.B. 736 (1979), *enforced,* 658 F.2d 746 (10th Cir.1981), in which the entire Board, acting sua sponte, overturned an earlier panel decision, *American Can Co.,* 235 N.L.R.B. 704 (1978), which had approved a layoff preference

for a union guard and a union trustee, neither of whom had on-the-job duties of contract administration.

**12.** Of the *Limpco* Board only Member Jenkins (a dissenter) remained to consider *Gulton.*

cient union representation. In support of this contention the union cites many cases in which the Board and courts of appeal have approved superseniority provisions for such reasons.

■ If the union is asking us to substitute our judgment for the Board's as to the proper justification for superseniority provisions, we decline to do so. The Board has determined that such provisions are justified only when they are necessary for the effective administration of the collective bargaining agreement on the job. We cannot upset this determination unless we are satisfied that it is irrational or inconsistent with the Act. This is not shown by arguments to the effect that a different weighing and balancing of the competing interests involved would support a broader standard of justification. For similar reasons we find unpersuasive the contention of the union in *Otis Elevator* that the Board has failed to balance properly the individual rights protected by § 8(a)(3) and § 8(b)(2) against the collective rights the Act is designed to foster and protect. The union states that the function of layoff-and-recall preferences for union officers is to assure continuity of local union leadership, and that continuity in office enables the union to carry out its legally mandated duties of fair and effective representation and to bargain collectively. The Board expressly considered the value of continuity of office in *Gulton, see* 266 N.L.R.B. at 409; *supra* p. 15, and found it to be insufficient justification. We cannot say that its determination was irrational or contrary to the Act.

The union in *Ex-Cell-O* argues that the *Gulton* rules constitute a radical departure from previously established principles and precedents. Construing this as an argument that the *Gulton* rules are irrational or contrary to the Act, we find it insufficient. The union lists four supposedly well-established principles that the Board allegedly ignored: (1) the employee's § 7

rights must be balanced against his correlative right to engage in effective collective bargaining through union representatives of his choice; (2) preferential seniority is not so inherently discriminatory that it cannot be justified by evidence of a legitimate purpose; (3) preferential seniority which promotes the effectiveness and efficiency of the local union in discharging its duty to employees is justified; and (4) preferential seniority which serves a legitimate purpose assists rather than impedes employees' exercise of their rights under the Act.

We are puzzled by (1); the employee's right to engage in collective bargaining through union representatives of his choice *is* a § 7 right. Perhaps instead of *all* § 7 rights the union means only that the employee's § 7 right not to have job benefits tied to union activism must be balanced against his right to engage in collective bargaining. If so, we think the Board, in deciding *Gulton,* was mindful of (1). The Board simply disagrees with the union as to which right preponderates.

Principle (2) is a distortion of the law. The lawfulness of a superseniority provision under § 8(b)(2) does not depend on the magnitude of its tendency to discriminate but on the magnitude of the encouragement it gives to employees to become union activists, given that it discriminates.[13] A second flaw in principle (2) is its failure to note that not any legitimate purpose constitutes adequate justification. The purpose must be sufficiently substantial to override the tendency of the preference to encourage union activism. The present Board, of course, would admit that preferential seniority can sometimes be justified—but only for employees who must be on the job to carry out their duties in administering the collective bargaining agreement.

It is unfair to say that the Board has ignored principle (3). That principle is simply a variant of the rule of *Limpco,* which

---

**13.** Preferential seniority is unquestionably inherently discriminatory, and no member of the Board has ever doubted it. *See Dairylea,* 219 N.L.R.B. at 658 (superseniority clauses inherently tend to discriminate against employees for Union-related reasons); *Limpco,* 230 N.L.R.B. at 409 (Members Jenkins and Penello, dissenting) (superseniority is discriminatory by its very nature).

the Board considered and expressly overruled in *Gulton.* As for (4), we think it is merely argumentative; our study of the history of superseniority before the Board leaves us convinced that no such principle has ever been endorsed or presupposed in any case on the subject.

■ It is also clear that the Board's previous decisions do not bind it in later proceedings with anything like the force of the doctrine of stare decisis in the courts. The Board is free to change its mind on matters of law that are within its competence to determine, provided it gives a reasoned analysis in support of the change. *See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1093 (7th Cir.1984). We find that this requirement is met in *Gulton* and its progeny. Even if the Board adopts a rule in a decision that is subsequently enforced by a court of appeals, it may later change the rule. Enforcement reflects only a determination by the court of appeals that the rule is rational and consistent with the Act, not that it is the uniquely correct rule.

In addition, the history of officer superseniority before the Board provides scant support for the idea that the rule of *Limpco* represents a stable determination of what the law ought to be. That rule never commanded the support of more than two members.[14] The reasoning of those members, as set forth in *Limpco,* contained an unexplained transition from a narrower to a broader rule. *See supra* note 10 and accompanying text. While the court of appeals denied the union's petition for review in *Limpco, D'Amico v. NLRB,* 582 F.2d

820 (3d Cir.1978), the court interpreted the Board's rule as requiring the union to prove that the beneficiary of superseniority had duties that help to implement the collective bargaining agreement,[15] a restriction at variance with the broad interpretation of *Limpco* advanced by the unions in the cases before us. According to the court, "[a]ny less rigid interpretation of the Board's ruling would leave substantial room to dilute the statutory neutrality principle *without the requisite collective bargaining justification.*" *Id.* at 825 (emphasis added). This may be read as an implied disapproval of the broader interpretation of the *Limpco* rule advocated by the unions here. Furthermore, the authoritativeness of *Limpco* was put in question by the Board itself in *American Can Co.,* when with no change of composition it overruled the earlier panel decision. *American Can Co.,* 244 N.L.R.B. 736 (1979), *enforced,* 658 F.2d 746 (10th Cir.1981); *see supra* note 11. We think that that case gives a better picture than *Limpco* of the state of the Board's view on the issue of superseniority for officers during the period from *Dairylea* until the Board's membership changed. We note also that the position of the Board in *Gulton* as to the sorts of reasons that can and cannot justify superseniority for officers was no new invention, distilled out of thin air. It was basically the position of the *Limpco* dissent, supported by two members of the Board and vigorously argued in *Limpco* and *American Can Co.*

The union in *Ex-Cell-O* also argues that the Board reached its decision without actually balancing the interests implicated by the specific facts of the instant case. We think the Board has been engaged in balancing the relevant factors ever since *Dairylea,* and that the rule in *Gulton* incorpo-

---

**14.** The decision in *Limpco* was by aggregate majority. Chairman Fanning and Member Truesdale supported the broad *Limpco* rule, while Member Murphy, who advocated a different rule, concurred in the result. Members Jenkins and Penello dissented.

**15.** The court said:

[W]e read the Board decision as requiring the Union to show that the Recording Secretary, as part of her official responsibilities and not

merely as a volunteer, performed services which directly assisted in implementing the collective bargaining agreement. We take this to mean that the Union was obligated to produce credible proof that the individual in question was officially assigned duties which helped to implement the collective bargaining agreement in a meaningful way.
582 F.2d at 825.

rates the present Board's considered judgment as to how the balance should be struck. Our study of the history of superseniority before the Board persuades us that different points of view have been thoroughly ventilated, including that advocated by the unions here, and we are impressed by the fact that in *Gulton* the Board for the first time achieved unanimity. In balancing, the Board is permitted to form generalizations about classes of cases based on its experience and to apply these generalizations to future cases. It is not required to conduct on the record a detailed analysis of each case in the light of first principles, as if the issue had never before arisen.

Of course, generalizations made on the basis of past cases may be put into question by future cases presenting an unforeseeable yet compelling constellation of facts. We are persuaded that the cases before us today are not of that kind. In *Ex-Cell-O* the sole reason given by the union for assigning the recording secretary to the day shift is that the assignment makes it easier for her to communicate with the president. We see no evidence in the briefs or the record that the union tried to solve the communication problem in some other way. We do not see why the president and the recording secretary cannot confer daily by telephone at mutually convenient times, nor why they cannot pass documents back and forth by means of some such device as a lock box mounted at a convenient place in the plant. The gain in convenience from face-to-face talks over the next best method of communicating strikes us as simply inadequate to justify tying a seniority-linked employment benefit such as shift preference to a union office and denying another employee her choice of shift when her seniority would otherwise entitle her to it.

In *Otis Elevator* the union argues at length that the value of having its financial secretary-treasurer continuously employed justified a layoff-and-recall preference for him. But under the facts of the case, that line of argument is immaterial. The financial secretary-treasurer would not have been laid off, even if he had not had the preference; he would only have been transferred to a lower paying job. *See supra* note 6 and accompanying text. We are at a loss to see how protection of officers from reduction in grade as a result of a layoff is of any benefit to anyone but the officers. Continuity of employment obviously has nothing to do with it.

2. Arguments That the Board Improperly 'Applied the *Gulton* Rule to the Facts

The union in *Ex-Cell-O* argues that the Board improperly applied the *Gulton* rule to the facts of the instant case. It contends first that the recording secretary had contract administration duties making her assignment to the day shift lawful under *Gulton*. She maintained the membership list used for the check-off of dues, she handled all health insurance claim disputes with the insurance carrier, she prepared a list of unresolved grievances, and she processed internal union appeals that could cause settled grievances to be reinstated. This argument is fatally flawed by the union's failure to show that these are on-the-job duties that require her presence on the day shift. The rule of *Gulton* is not that any person with contract administration duties, however broadly construed, may lawfully have any kind of superseniority; it is rather that persons with on-the-job contract administration duties may lawfully have such superseniority as enables the person to stay on the job to carry out those duties. It seems clear that the duties recited by the union are not of that sort.

The union also argues that if the facts are analyzed by the tests of *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (discussed *supra* p. 488), the shift preference provision in question would have to be sustained as lawful. In particular, the union contends that under *Great Dane* the provision could not be struck down without proof that it was unlawfully motivated. This argument does not purport to show that the Board misapplied the *Gulton* rule; it is simply another attack on the rule

itself. Treating it as such, we disagree. The *Gulton* rule is entirely compatible with *Great Dane.* If superseniority preferences are inherently destructive of the § 7 rights of employees, then under *Great Dane* it is not necessary for the General Counsel to prove improper motivation separately. *See supra p.* 488. We do not, of course, decide that superseniority preferences are inherently destructive of the § 7 rights of employees; we say only that such a determination, if made by the Board, would not necessarily be irrational or contrary to the Act. Similarly, it would not necessarily be irrational or contrary to the Act for the Board to find that the only legitimate business purpose that is sufficiently substantial to justify a superseniority preference is that the preference is necessary to enable the employee to be on the job to carry out contract administration duties that require his presence on the job. The rule in *Gulton* could thus be reached by reasoning from the principles of *Great Dane. Great Dane*, therefore, does not require a contrary result.

■ We find substantial evidence in the record to support the Board's determination that the recording secretary in *Ex-Cell-O* and the financial secretary-treasurer in *Otis Elevator* did not have on-the-job duties of contract administration. When the *Gulton* rule is applied to these findings, it follows straightforwardly that the superseniority provisions in issue were unlawful. There was thus no error in the Board's application of the rule.

### 3. Waiver

■ The union in *Otis Elevator* contends that it has waived the employee rights the Board seeks to vindicate. As authority the union cites *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 1467 (1983), which states:

This Court long has recognized that a union may waive a member's statutorily protected rights, including "his right to strike during the contract term, and his right to refuse to cross a lawful picket line." [Citation omitted.] Such waivers are valid because they "rest on 'the premise of fair representation' and presuppose that the selection of the bargaining representative 'remains free.' " [Citations omitted.] Waiver should not undermine these premises. Thus a union may bargain away its members' economic rights, but it may not surrender rights that impair the employees' choice of their bargaining representative. [Citation omitted.]

*Id.* at 705–06, 103 S.Ct. at 1476. The right that the union contends it has waived is the right of employees to be free of the limitations on their seniority rights that superseniority for officers imposes. This, it claims, is an economic right subject to waiver under *Metropolitan Edison.* This argument fails because it misidentifies the right that the Board seeks to vindicate. The Board has declared superseniority for officers not involved in on-the-job administration of the collective bargaining agreement to be unlawful not because it impairs the natural seniority rights of employees but because it impairs their right to be free of discrimination that encourages union activism. This is not an economic right, because it is not a right to engage in some form of concerted activity, such as a strike, for the purpose of achieving economic advantage. *See NLRB v. Niagara Machine & Tool Works,* 746 F.2d 143, 150 (2d Cir. 1984); *NLRB v. Midstates Metal Products, Inc.,* 403 F.2d 702, 705 (5th Cir.1968). We think that the right of employees to be free of discrimination that encourages union activism is one that the union may not surrender through collective bargaining, because the purpose of the right, as reflected in § 8(b)(2) of the Act, is to protect employees from certain forms of union conduct that benefit the union at the expense of the employees' § 7 rights. This purpose would be frustrated if the union had authority to waive the right. We also think that the waiver of the right would impair the employees' choice of their bargaining representative by enabling an incumbent union to encourage the active support of employees through the lure of employment bene-

fits tied to positions in the union. Under the rule of *Metropolitan Edison,* therefore, the right may not be waived. *See NLRB v. Magnavox Co.,* 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974); *Local 900, IUE v. NLRB,* 727 F.2d 1184, 1190 (D.C.Cir.1984).

### III

We have given careful consideration to all the points and arguments made by the unions in both cases, whether expressly discussed in this opinion or not. Our analysis of the provenience of the *Gulton* rule and of the unions' arguments against it persuades us that the rule is both rational and consistent with the Act. Therefore, we join with the two other circuits that have reviewed the rule and have declined to overturn it. *See NLRB v. Niagara Machine & Tool Works,* 746 F.2d 143 (2d Cir.1984) (enforcing an application of *Gulton* ); *Local 900, IUE v. NLRB,* 727 F.2d 1184 (D.C.Cir.1984) (enforcing *Gulton* ). There is no question that the Board correctly applied the rule to the facts of the cases before us and that its rulings are supported by substantial evidence on the record as a whole. Accordingly, in No. 83–2900 the petition to set aside the Board's order is denied, and in No. 83–3153 and No. 84–1170 the orders of the Board are enforced.

SO ORDERED.

SWYGERT, Senior Circuit Judge, dissenting.

Adjudication of labor disputes often requires the National Labor Relations Board ("the Board") to balance the conflicting interests protected by the National Labor Relations Act, *codified as amended* at 29 U.S.C. §§ 151–69 (1982) ("the Act"). Given the Board's expertise in labor relations, we owe considerable deference to its judgment. But there is an important distinction between deferring to a particular balance of contending interests struck by the Board and deferring to a "balance" that is reached by studiously ignoring fundamental interests that Congress meant to pro-

tect. In short, the Board may not "balance" with its thumb on the scales.

It is a common practice for unions to negotiate for inclusion in collective bargaining agreements superseniority provisions that confer benefits on union officials that their seniority would not otherwise entitle them. *See generally* Note, *Superseniority: Latitudes and Limitations,* 49 U.Cin. L.Rev. 832, 832–33 & n. 8 (1980). These benefits are not "gravy"; rather, they are legitimate insofar as they are necessary to allow union officials to better serve all employees of the bargaining unit. *See Dairylea Cooperative, Inc.,* 219 N.L.R.B. 656, 658 (1975), *enforced sub nom. NLRB v. Milk Drivers Local 338,* 531 F.2d 1162 (2d Cir.1976). Thus, it may be necessary to give stewards special rights with respect to layoff and recall so that the employees are assured that the collective bargaining agreement will be administered and their grievances processed by the continued presence of experienced stewards. *See id.* But the Board has reasoned that superseniority rights may infringe on a countervailing interest protected by section 7 of the Act: the right to be a "good, bad, or indifferent" union member. *See Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954). That is, by rewarding employees who choose to become union activists and work their way up the union hierarchy, superseniority provisions coerce employees to become "good," rather than "bad" or "indifferent" union members. *See Dairylea,* 219 N.L.R.B. at 657–58.

If this were the only countervailing interest at stake, one might wonder why the Board is even concerned about superseniority rights. As Member Fanning has pointed out, any superseniority benefits associated with union service are so remote and so contingent that they probably have no significant impact on an employee's choice to support the union or to pursue union office. *Dairylea,* 219 N.L.R.B. at 662 (Member Fanning, dissenting). The problem would be more fruitfully approached by focusing on the very real danger of a conflict of interests: union officials may

negotiate for special benefits for themselves or their colleagues without due regard for the well-being of all the employees they represent. Such self-interested negotiation would be a breach of the union's duty of fair representation as well as the kind of discrimination prohibited by section 8(b)(2) of the Act.

In any event, it is incumbent on the Board to strike a balance between the conflicting interests at stake however they are defined. In *Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406 (1983), *enforced sub nom. Local 900, IUE v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984), the Board decided that the appropriate rule was to uphold only those superseniority provisions that allowed stewards or steward-type officials to remain on the job for the purposes of grievance processing and on-the-job contract administration. *Id.*, 266 N.L.R.B. at 409. The Board rejected the argument that broader interests in union efficiency might justify other types of superseniority provisions. Indeed, it concluded such a purported interest should receive *no weight:* "The Board should not be in the business of assuring that a union has an efficient and effective organization to conduct collective bargaining where this results in the linkage of job rights and benefits to union activities." *Id.* (quoting *United Electrical, Radio and Machine Workers of America, Local 623 [Limpco Manufacturing, Inc.]*, 230 N.L.R.B. 406, 409 (1977) (Members Jenkins & Penello, dissenting)).

The refusal even to consider the interest in union efficiency—to accord it no weight in the balancing analysis—is fundamentally inconsistent with section 7 of the Act. In essence, the Board adopts a false dichotomy between the union's institutional interests in efficiency and the section 7 rights of employees: on one side of the scales are section 7 rights—the rights of employees to determine what kind of union member they choose to be without pressure in the form of special superseniority benefits for those who choose to climb the union hierarchy; on the other side of the scales is the reified "union"—an alien institution with interests completely distinct from the section 7 interests of the employees. Given this dichotomy, the Board concludes that the institutional interests deserve no weight and may never outweigh the slightest infringement of section 7 rights.

A more tenable and traditional conception of the "union," however, is as a collection of employees who have chosen to exercise their section 7 rights to organize and to pursue their common interests. And, as the exclusive bargaining agent of all the employees, it has the duty to secure the economic interests and section 7 rights of all. Therefore, an efficient union is both a manifestation of section 7 rights and a means of securing those rights. It is very much the "business" of the Board, then, to "assur[e] that a union has an efficient and effective organization to conduct collective bargaining." Were this not the case, the union shop would be illegal: for such an institution "coerces" section 7 rights by forcing employees to support the union financially simply for the purpose of allowing the union to realize the efficiencies of eliminating free riders. *See NLRB v. General Motors Corp.*, 373 U.S. 734, 740–41, 83 S.Ct. 1453, 1458–59, 10 L.Ed.2d 670 (1963). Both union efficiency and the rights of employees to be free from pressure to become union activists implicate section 7 rights. The Board's duty is to balance the two. Here it did not fulfill that duty by refusing to accord any weight in any circumstances to the former concern.

The unions in the two cases at bar presented colorable efficiency claims that merited the Board's attention, not an offhand dismissal as not within the "business" of the Board.* It is undisputed that the

---

* In both cases, the Board cited *Gulton* as dispositive and refused to engage in any balancing of efficiency concerns and section 7 rights. In *Ex-Cell-O*, the Board reiterated its comment about the appropriate "business" of the Board: "While it is clear that affording the recording secretary superseniority for shift preference would make Respondent Union's operations more efficient and effective, the Board is not in the business of promoting such concerns at the expense of Section 7 rights." Decision and Order at 5.

intent of the superseniority clause in *Ex-Cell-O* was to ensure that the union president and recording secretary both worked the day shift. The Administrative Law Judge found that "when the two officers are on different shifts, communication breakdowns can and have occurred with adverse results to the functioning of the Union." Decision and Order at 8. The efficiencies gained by the superseniority redounded to the benefit of all and implicated section 7 rights by facilitating "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Accordingly, the Board should have factored efficiency concerns into its balancing analysis.

The efficiency claims in *Otis Elevator* are less compelling, though not as weak as the majority would portray. *See ante* at 493. It is true that the superseniority clause in that case offered the union official broad protections not only against layoff, but also against transfer to a lower paying job. The union argues, however, that such transfers may force officers to give up their posts by virtue of being transferred into another "jurisdiction" and may inhibit the performance of their union duties as they spend more time adapting to new jobs and new surroundings. IUE's Brief at 28. These claims may not deserve overriding weight, but they should not be ignored by the Board.

In sum, we should refuse to enforce a decision of the Board where "the role assumed by the Board ... is fundamentally inconsistent with the structure of the Act and the function of the section relied upon." *Giddings & Lewis, Inc. v. NLRB*, 675 F.2d 926, 929 (7th Cir.1982) (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)). Here the Board has announced that it is "not in the business of" giving *any* weight to union efficiency concerns. This is a perverse reading of section 7 of the Act because efficient unions are themselves the expression of the section 7 rights of union members and operate to secure the section 7 rights of all employees in the bargaining unit. The Board's assertion evinces an unseemly hostility against trade unionism.

I would deny enforcement of the Board's orders in both consolidated cases.