**WPIX, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**and**

**Radio and Television Broadcast Engineers Union, Local 1212, I.B.E.W., AFL–CIO, Intervenor.**

**No. 170, Docket 88–4060.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1988.

Decided March 21, 1989.

Susan M. Benton–Powers, Chicago, Ill. (Richard L. Marcus, Sonnenschein Carlin Nath and Rosenthal, Chicago, Ill., of counsel), for petitioner-appellant.

David A. Fleischer, Atty., N.L.R.B., Washington, D.C. (Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Supervisory Atty., N.L.R.B., Washington, D.C., of counsel), for respondent.

William T. Josem, Philadelphia, Pa. (Richard H. Markowitz, Markowitz & Richman, Philadelphia, Pa., of counsel), for intervenor.

Before KEARSE, PRATT and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Petitioner WPIX, Inc. ("WPIX") petitions for review of a decision and order of the National Labor Relations Board (the "Board") which dismissed the Board's complaint on behalf of WPIX against Local 1212 of the Radio and Television Broadcast Engineers Union, I.B.E.W., AFL–CIO (the "Union"). The complaint charged the Union with violating section 8(b)(1)(A) and (2)[1] of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A) and (2) (1982), by (1) maintaining a provision of the collective bargaining agreement between WPIX and the Union that provides Union officials a longer leave of absence than is afforded to other employees, and prohibits only employees not on Union business from seeking or accepting other employment while on leave of absence; (2) demanding reinstatement of a Union official pursuant to that provision; and (3) filing for arbitration when WPIX rejected that demand. We have jurisdiction pursuant to NLRA § 10(f), 29 U.S.C. § 160(f) (1982).

Concluding that the standard by which the Board evaluated the contractual provision was reasonable, as were the Board's application of the standard to the facts of this case and its allegedly retroactive enforcement of its decision, we deny the petition for review.

## Background

WPIX and the Union have been parties to successive collective bargaining agreements since at least 1949. Since 1971, each of these agreements, including the ones in force during all times pertinent here (collectively the "Agreement"), has included the following provisions:

> *Section 3.09:* (a) At the written request of the Union, for the conduct of Union business in connection with the broadcasting industry only, any employee shall be granted a leave of absence without pay *for a period not to exceed two (2) years.* Such employee's seniority shall continue to accrue throughout such a leave *for layoff purposes only.*

---

1. NLRA § 8(b)(1)(A) and (2) reads in relevant part:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
   (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title ...;
   (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section....
   29 U.S.C. § 158(b)(1)(A) and (2) (1982).

   NLRA § 8(a)(3), to which section 8(b)(2) refers, reads in relevant part:
   (a) It shall be an unfair labor practice for an employer— ...
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
   29 U.S.C. § 158(a)(3) (1982).

(b) Leave of absence may be granted by [WPIX] *for a period not to exceed six (6) months* upon written application by any employee, stating reasons therefor and, if the leave is for a month or more, the approval of the Union, provided that no employee shall apply for a leave of absence *primarily to enable him to solicit or accept employment elsewhere.* Such employee shall continue to accrue seniority throughout such leave of absence for *layoff purposes only.*

. . . .

(d) Upon the return of an employee from a leave of absence, he/she shall be reemployed in the same position or a position generally similar to that in which he/she was previously employed and with the same experience or length of service rights held immediately preceding such leave.

Emphasis added.

The provisions that prompted the charge by WPIX which gives rise to this litigation are: (1) those allowing a leave of absence for the conduct of Union business for up to two years, but limiting other leaves of absence to six months; and (2) the prohibition of leaves "primarily . . . to solicit or accept employment elsewhere" only in the case of the non-Union business, six-month leaves.

In 1968, Joseph Tomaselli ("Tomaselli") was hired by WPIX as a film splicer. In 1978, he was transferred to WPIX's engineering department and became a member of the Union. By letter dated August 19, 1982, the Union informed WPIX that Tomaselli had been appointed a business representative of the Union and would be taking a leave of absence from WPIX effective August 25, 1982, pursuant to section 3.09(a) of the Agreement. Tomaselli discussed the leave with Robert Murch ("Murch"), WPIX's chief engineer, who approved the leave. There was no discussion of the question whether a position would be

available for Tomaselli when he wanted to return to WPIX. Tomaselli was the only WPIX employee ever granted a leave of absence to work full time for the Union. During Tomaselli's absence, WPIX continued his medical insurance and group life insurance coverage, with the Union reimbursing WPIX for the premiums paid by WPIX on behalf of Tomaselli.[2]

As a business representative, Tomaselli negotiated collective bargaining agreements on behalf of the Union with twenty-five television and radio stations. He also processed grievances and participated in arbitration proceedings.

By letter dated May 25, 1984, the Union notified WPIX that Tomaselli's leave of absence would be extended an additional two years. WPIX later denied receiving this letter. In an arbitration described *infra,* however, the arbitrator concluded that the Union had notified WPIX concerning Tomaselli's extension and WPIX had acquiesced therein, based upon (1) a presumption that the Union's letter had been mailed and delivered, (2) the fact that WPIX continued to deal with Tomaselli as the Union's business representative during the extension period, and (3) the continued recognition of Tomaselli's leave status by continued payment of insurance premiums (subsequently, as theretofore, reimbursed by the Union). The administrative law judge "assumed without deciding" that an extension was effected, and the Board so found. In its reply brief on appeal, WPIX states that "[t]he propriety of the Arbitrator's award extending Tomaselli's leave of absence from two to three years is now before the United States District Court for the Southern District of New York . . . and is not at issue in this proceeding."

By letter dated July 3, 1985, Tomaselli informed WPIX that he no longer served the Union as business representative, and requested reinstatement to his former posi-

---

**2.** Although the complaint herein initially alleged "the option to continue in WPIX's medical and group life insurance program" as a discriminatory benefit provided to Tomaselli, the administrative law judge dismissed this allegation, finding that (1) WPIX paid medical insurance premiums for other employees on leave of absence, while the Union paid Tomaselli's premiums; (2) there was no provision in the Agreement concerning the matter; and (3) the Union made no demand concerning it. WPIX filed no exception with the Board concerning this determination, and has raised no issue with respect to it on this appeal.

tion at WPIX. By letter dated July 11, 1985, Murch responded that no vacancies existed at WPIX and that Tomaselli would be refused employment. By letter dated July 23, 1985, the Union demanded that WPIX reinstate Tomaselli, citing section 3.09 of the Agreement and advising that the letter constituted "the Union's grievance protesting the failure of WPIX, Inc. to restore Mr. Tomaselli to employment," which grievance would be pursued "through the steps provided for in the collective bargaining agreement" unless "satisfactorily resolved." By letter dated July 29, 1985, WPIX refused the Union's demand to reemploy Tomaselli, contending that WPIX had never received, much less approved, the May 25, 1984 letter extending Tomaselli's leave of absence, which accordingly expired after two years. The WPIX letter also stated:

> You are no doubt aware that the law prohibits employers from according benefits to officers or employees of labor organizations which represent their employees. While Section 3.09 of our agreement may conceivably represent a legitimate exception to these legal prohibitions, the extension of benefits (*i.e.*, reinstatement rights) which you and Mr. Tomaselli are now seeking is, in our opinion, wholly unwarranted under the law (and as noted above, under our collective bargaining agreement).

On August 2, 1985, WPIX filed a charge with the Board alleging that the Union's demand that Tomaselli be reinstated violated sections 8(b)(1)(A) and (2) of the NLRA because, in making that demand,

> the Union is attempting to cause the Employer to violate Section 8(a)(3) of the Act in that it is attempting to cause the Employer to encourage membership in and loyalty to the Union by providing a job-related benefit to employees who participate in Union business that is not provided to employees who refrain from participating in Union business.

By letter dated September 30, 1985, the Regional Director of the Board, Region 2, refused to issue a complaint.

The Union demanded arbitration on August 8, 1985. The grievance was heard before Arbitrator Milton Rubin on December 16, 1985. On February 20, 1986, the arbitrator issued an award to the Union declaring that WPIX violated the Agreement by refusing to reinstate Tomaselli. WPIX was ordered to offer Tomaselli employment and to compensate him for lost wages and benefits. The sole issue decided was whether Tomaselli's leave of absence had been validly extended beyond two years, and as discussed *supra*, this issue was determined in the Union's favor. No statutory issue was considered.

On February 24, 1986, the General Counsel of the Board granted WPIX's appeal from the Regional Director's refusal to issue a complaint and directed issuance of a complaint. A hearing was then held before Administrative Law Judge Steven B. Fish (the "ALJ") on June 18, 1986. The ALJ issued a decision on January 16, 1987 which determined that the Union violated section 8(b)(1)(A) and (2) of the NLRA by maintaining and enforcing section 3.09(a) of the Agreement. The ALJ recommended an order directing the Union to cease and desist from maintaining and enforcing Section 3.09(a) of the Agreement, and to withdraw the grievance filed on behalf of Tomaselli.

In reaching this conclusion, the ALJ relied primarily upon two Board precedents: *Dairylea Coop. Inc.*, 219 N.L.R.B. 656 (1975), *enforced sub nom. NLRB v. Milk Drivers and Dairy Employees Local 338*, 531 F.2d 1162 (2d Cir.1976); and *Mead Packaging*, 273 N.L.R.B. 1451 (1985).

In *Dairylea*, a so-called "superseniority" provision in a number of collective bargaining agreements specified that a shop steward "shall be considered the Senior employee in the craft in which he is employed" with respect to all contractual benefits where seniority is a consideration, including layoff, recall, assignment of overtime, selection of vacation period, and assignment of driver routes and other positions, with the preference extending to the selection of shift, hours and days off. *Dairylea*, 219 N.L.R.B. at 657. The Board approved the provision as it related to layoff

and recall, because in that aspect "it furthers the effective administration of bargaining agreements on the plant level by encouraging the continued presence of the steward on the job," *id.* at 658, but rejected it as "presumptively unlawful" in its other applications because it "ties job rights and benefits to union activities, a dependent relationship essentially at odds with the policy of the Act, which is to insulate the one from the other," *id.*

*Mead Packaging* involved an alleged violation of NLRA § 8(a)(1) and (5) [3] by employers for unilaterally ceasing to provide contractual increases in pension benefit multipliers, and group insurance coverage, to union officers (not shop stewards) on union-related leaves of absence. The pertinent collective bargaining agreement provided employees the right to take leaves of absence for up to four years in order to accept employment as officers of the union. *Mead Packaging,* 273 N.L.R.B. at 1452. Other than for union employment as elected or appointed union officials, the employers in question never allowed any employee a leave of absence to take another job. *Id.* at 1454. The Board found that the employers in question provided benefits to the union officers which did not " 'further the effective administration of bargaining agreements on the plant level by encouraging the continued presence of the steward on the job.' " *Id.* at 1452 (quoting *Dairylea,* 219 N.L.R.B. at 658). The Board therefore concluded that the employers did not violate NLRA § 8(a)(1) and (5) by declining to continue the benefits without bargaining with the union, and stated in dictum that were the issue before it, it would find the underlying contractual provisions violative of NLRA § 8(a)(3) and (b)(2). *Id.*

Citing *Dairylea* and *Mead Packaging,* the ALJ determined that section 3.09(a) of the Agreement, in providing employees on leave for Union business with a longer leave of absence and the opportunity to be employed elsewhere, accorded them "significant" disparate benefits which had a

"substantial adverse effect on the rights of other unit employees." Employees on a union leave of absence were deemed to receive "a substantial opportunity for career development and advancement, which is denied to other employees." The adverse effect on other employees, in the ALJ's view, resulted from the continued accrual of the Union official's seniority, for layoff purposes, during his leave of absence, with the result that upon returning to the employ of WPIX, the Union official would be senior (for layoff purposes) to fellow employees who had spent more time at work at WPIX. The ALJ concluded that the preference provided by section 3.09(a) of the Agreement was "akin to" the superseniority preference deemed unlawful in *Dairylea,* and was accordingly invalid.

The ALJ was "somewhat troubled" by *International Alliance of Theatrical Stage Employees Local 695,* 261 N.L.R.B. 590 (1982) ("*IATSE*"). In *IATSE,* the collective bargaining agreement provided that a union official returning from a leave of absence would be "re-employed in his former job ... on the same basis and seniority as though he had never left such job;" if that job was unavailable, the employer was to "give such employee preference of employment for any job available, within the classifications of the bargaining unit." *Id.* at 591. The Board adopted the recommended order of the administrative law judge dismissing the employer's complaint that enforcement of the quoted provision constituted an unfair labor practice. *Id.* at 590. The administrative law judge's decision concluded that the provision was "no preference, but merely a restoration." *Id.* at 593. The ALJ below concluded, however, that *IATSE* had been implicitly overruled by *Mead Packaging.*

■ The Union filed exceptions to the ALJ's decision with the Board. On April 1, 1988, the Board issued a decision and order reversing the decision of the ALJ and dismissing the complaint. *Radio and Tele-*

---

**3.** N.L.R.A. § 8(a)(1), 29 U.S.C. § 158(a)(1) (1982), is set forth in note 1 *supra.* N.L.R.A. § 8(a)(5), 29 U.S.C. § 158(a)(5) (1982), provides

that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."

*vision Broadcast Eng'rs Union Local 1212,* 288 N.L.R.B. No. 49 (Apr. 1, 1988). In doing so, the Board adopted and applied the following three-part test:

First we look to see whether the provision treats employees differently on the basis of union status or activity. Next we look at whether this distinction tends to encourage the union status or activity in question. If the answer to either of those first two questions is no, then we need not reach the third step. If the answer to both is yes, then we determine whether the disparate treatment that tends to encourage or discourage union activity is justified by policies of the Act.

*Id.* at 8.[4]

■ Regarding the first step, the Board found that section 3.09 of the Agreement did "treat employees differently on the basis of union-related considerations." *Id.* Regarding the second step, however, the Board concluded that the contractual distinction "does not tend to encourage employees to become active unionists so that they might be selected to take temporary union jobs. Instead, it merely removes, in part, a condition that would discourage employees from taking temporary union jobs." *Id.* at 8–9. The Board went on to say:

Thus, an employee who stays at his job with WPIX is no worse off with respect to seniority than an employee who takes a leave of absence to work for the Union; and that employee who remains on the job is no more disadvantaged by his fellow employee's having taken the leave for that purpose than he would be if that individual had remained on the job. It is unreasonable to suppose that an employee would take an outside-the-plant union job simply to retain the seniority that he would possess even if he did not take such job. Were he faced with the prospect of *losing* such seniority, however, he might well be discouraged from tak-

ing leave to engage in that particular union activity.

*Id.* at 9.

The Board dismissed as insignificant and speculative, in terms of its second-step analysis, the fact that a Union official on leave of absence would be paid by the Union and might advance to further Union jobs. *Id.* at 9 n. 13. The Board noted that in view of section 3.09(d) of the Agreement, which provides that aside from layoff, the seniority of an employee returning from a leave of absence is based upon the employee's seniority immediately preceding the leave, "an employee who took leave to take a union job in the broadcasting industry might in fact come back at a disadvantage —relative to those who took no leave— when seniority for other purposes, e.g., qualification for holiday and vacation pay, was concerned." *Id.* at 9 n. 14.

Since the Board answered the second question in the negative, it ended its analysis without considering the third question.

The Board distinguished *Dairylea* and a similar case on the ground that the agreements in those cases provided superseniority, thus "encourag[ing] employees to become union officers because they gained seniority they could not have possessed had they not done so." *Id.* at 10. The Board instead followed *IATSE*, observing that section 3.09(a) of the Agreement restored the returning Union official to "no better position than if he had never left, rather than [providing] a preference or benefit." *Id.* The Board added that "to the extent that the foregoing analysis is inconsistent with *Mead Packaging,* ... we overrule that case." *Id.*

The Board concluded:

[W]e find that section 3.09 of the parties [sic] contract does not accord an unlawful preference to employees serving as union officials. Therefore, the Respondent's actions in seeking to have Tomaselli reinstated to his job at WPIX did not

---

4. Although the emphasis in this case is upon the encouragement of union status or activity, we note that section 8(a)(3) prohibits discrimination "to encourage or discourage" it. Accord-

ingly, formulations which focus only upon encouragement (or discouragement) are to be read in the context of the cases in which they occur.

violate Section 8(b)(1)(A) and (2) of the Act.

*Id.*

This appeal followed.

## Discussion

WPIX raises three claims on appeal. First, WPIX contends that the second prong of the Board's three-part test—whether the leave provision tends to encourage union activity—is an "unreasoned and radical departure" from Board precedent. Second, WPIX contends that in any event, the second question should have been answered in the affirmative. Third, WPIX argues that the Board's decision should not have been applied to WPIX retroactively.

We begin by considering the proper standard for our review, which is provided by *Ford Motor Co. v. NLRB,* 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), in the following terms:

> Of course, the judgment of the Board is subject to judicial review; but if its construction of the [NLRA] is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute. *NLRB v. Iron Workers,* 434 U.S. 335, 350 [98 S.Ct. 651, 660, 54 L.Ed.2d 586] (1978). In the past we have refused enforcement of Board orders where they had "no reasonable basis in law," either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning. *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166 [92 S.Ct. 383, 390, 30 L.Ed.2d 341] (1971). We have also parted company with the Board's interpretation where it was "fundamentally inconsistent with the structure of the [NLRA]" and an attempt to usurp "major policy decisions properly made by Congress." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318 [85 S.Ct. 955, 967, 13 L.Ed.2d 855] (1965). Similarly, in *NLRB v. Insurance Agents,* 361 U.S. [477] at 499 [80 S.Ct. 419, at 432, 4 L.Ed.2d 454 (1960)],

we could not accept the Board's application of the [NLRA] where we were convinced that the Board was moving "into a new area of regulation which Congress had not committed to it."

*Id.* at 497, 99 S.Ct. at 1849; *accord, NLRB v. Niagara Mach. & Tool Works,* 746 F.2d 143, 148 (2d Cir.1984).

We next consider the decision of the Board in this case in light of these standards.

### A. *Reasonableness of the Board's "Encouragement" Test.*

WPIX argues that the second prong of the Board's three-part test—whether the distinction in benefits between union officials and other employees tends to encourage the union status or activity in question —"radically departs from the two-step disparate benefit analysis initially set forth in [*Dairylea* ] and refined in *Gulton Electro–Voice,* 266 N.R.L.B. 406 (1983), *enf'd sub nom. Electrical Workers U.E. Local 900 v. N.L.R.B.,* 727 F.2d 1184 (D.C.Cir.1984)." WPIX contends that the Board's prior jurisprudence established a two-step analysis that was basically identical to the first and third steps—disparate treatment and policy justification—of the analysis employed here. We conclude, however, that no radical departure has occurred, finding the standard here employed to be consistent with the Board's prior decisions, the language of the NLRA, and authoritative court interpretations of that statute.

As stated earlier, NLRA § 8(a)(3) prohibits an employer from "discriminat[ing] against an employee] in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage membership in any labor organization,*" and NLRA § 8(b)(2) makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violations of [§ 8(a)(3) ]." 29 U.S.C. § 158(a)(3) and (b)(2) (1982) (emphasis added). The plain language of the statute, therefore, establishes encouragement or discouragement of union membership as the centerpiece of a section 8(a)(3) or (b)(2) violation. *See*

*NLRB v. Milk Drivers & Dairy Employees Local 338*, 531 F.2d 1162, 1166 (2d Cir.1976) ("under §§ 8(a)(3) and 8(b)(2), encouragement of membership is a *sine qua non* of a violation"), enforcing *Dairylea Coop. Inc.*, 219 N.L.R.B. 656 (1975).

The Supreme Court authoritatively interpreted section 8(a)(3) to this effect in *Radio Officers' Union v. NLRB*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), stating:

> The language of § 8(a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; *only such discrimination as encourages or discourages membership in a labor organization is proscribed.*

*Id.* at 42–43, 74 S.Ct. at 336–37 (emphasis added); *see NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32, 87 S.Ct. 1792, 1796, 18 L.Ed.2d 1027 (1967) ("§ 8(a)(3) ... requires specifically that the Board find a discrimination and a resulting discouragement of union membership").

Finally, it is settled that:

> the phrase "encourage membership", as used in § 8(a)(3), encompasses not only discrimination which induces workers to join a union, but also conduct which encourages employees to be "good" union members, to support and assist the union, or to participate in union activities. *Radio Officers' Union v. N.L.R.B.*, 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–337, 98 L.Ed. 455, 476–478 (1954).

*Milk Drivers*, 531 F.2d at 1165.

Against this background, even if the Board decision herein departed radically from prior Board precedents in articulating the encouragement of union status or activity as necessary to a section 8(a)(3) violation, it could hardly constitute an inappropriate or invalid interpretation of the NLRA. We believe, however, that WPIX misreads the Board's precedents. The cases cited by WPIX deal for the most part with superseniority provisions in collective bargaining agreements. We addressed the Board's jurisprudence in this area, with specific reference to the "encouragement" issue, in *NLRB v. Niagara Mach. & Tool Works*, 746 F.2d 143 (2d Cir.1984), a case in which we enforced a Board order directing an employer and a union to cease enforcement of a superseniority provision. We there said:

> The Union contends that even if [*Gulton Electro–Voice, Inc.*, 266 N.L.R.B. 406 (1983), enforced sub nom. *Local 900, Int'l Union of Elec. Workers v. NLRB*, 727 F.2d 1184 (D.C.Cir.1984)] states the appropriate rule, the Board failed to prove that the superseniority clause here "encourage[s] membership" within the meaning of section 8(a)(3) of the Act. It is true that the Board's decision in this case does not directly address the question of encouragement. Nevertheless, *all of the superseniority cases*—from *Dairylea* to [*United Elec. Workers Local 623*, 230 N.L.R.B. 406 (1977), petition for review denied, *D'Amico v. NLRB*, 582 F.2d 820 (3d Cir.1978)] to *Gulton*—proceed from the premise that superseniority encourages workers to be good union members so that they might increase their chances of being selected for positions afforded superseniority. *See, e.g., Dairylea, supra*, 219 N.L.R.B. at 657–58; *Gulton, supra*, 266 N.L.R.B. at 409.

*Id.* at 149 (emphasis added).

In sum, we view the Board's articulation, in the decision here under review, of a three-part test for the analysis of alleged section 8(a)(3) violations as a natural evolution from its prior precedents, well rooted both in the language of that section and authoritative case law interpretations of that language. This conclusion is not affected by the fact that the Board overruled *Mead Packaging* to the extent that case was inconsistent with its analysis in the decision here under review. For, as the Supreme Court stated in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975):

To hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking. " 'Cumulative experience' begets understanding and insight by which judgments ... are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process."

*Id.* at 265–66, 95 S.Ct. at 967–68 (quoting *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953)).

### B. *The Board's Analysis of Section 3.09 of the Agreement.*

WPIX contends that even if the test employed by the Board was reasonable, it was erroneously applied to the facts of this case. Specifically, WPIX argues that section 3.09(a) of the Agreement encourages Union activity, rather than merely removing an impediment to such activity. In pressing that contention, moreover, WPIX stresses that the distinction "between encouragement and the removal of discouragement strains credibility," and is essentially meaningless.

Again, we disagree. The distinction is both meaningful and essential to a principled application of section 8(a)(3), which prohibits discrimination which *either encourages or discourages* union activity. The Board was therefore fully justified in following *IATSE*, and reasonably applied the rule thus formulated to the facts of this case.

Section 3.09 of the Agreement simply allows Union officials to return from a leave of absence in no worse seniority position, as to layoff only, than if they had continued to work at WPIX. The Board reasonably concluded that this provision did not constitute prohibited encouragement of union activity, and was clearly distinguishable from the superseniority provisions in the *Dairylea* line of cases, which provided union officials with enhanced seniority as a result of their union activities.

### C. *Retroactive Effect of the Board's Decision and Order.*

Finally, WPIX contends that if we decide to "enforce" the decision and order of the Board here under review, we should not do so "retroactively" because that decision and order set forth a new rule of law and WPIX reasonably relied on contrary prior precedent.

To begin with, we are not entirely clear that this argument has any relevance to the facts of this case. The Board determination under review dismissed the complaint filed by the Board on the basis of an unfair labor practice charge brought by WPIX. The "retroactive" impact which WPIX seeks to avoid is the reinstatement of, and award of back pay to, Tomaselli. The Board decision and order under review, however, does not order any such relief. Rather, in dismissing the complaint herein, the Board simply removed a potential impediment to the enforcement of section 3.09 of the Agreement with respect to Tomaselli in the arbitration, and subsequent litigation, in which his reinstatement and back pay are directly at issue.

In any event, assuming that WPIX's retroactivity contention is pertinent here, we find it unavailing. We have adopted the following test to determine whether a decision should be enforced retroactively:

(1) whether the particular case is one of first impression, (2) whether the new rule presents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Ewing v. NLRB*, 861 F.2d 353, 362 (2d Cir.1988) (quoting *NLRB v. Niagara Mach. and Tool Works*, 746 F.2d 143, 151 (2d Cir.1984)).

First, WPIX concedes that this case is not one of first impression. Second, as indicated earlier, we view the rule announced by the Board herein as in a line of evolution from its prior decisions. Or, as we put it in *NLRB v. Niagara Mach. & Tool Works*, "[r]ather than abruptly changing well-settled law, the Board ... fashioned a clear-cut rule that resolved the uncertainty created by its earlier decisions." 746 F.2d at 151. Third, nothing in the record suggests that WPIX relied upon Board precedents in refusing to reinstate Tomaselli. In fact, the ALJ's decision herein, although favorable to WPIX, specifically states: "Murch admitted that had Tomaselli requested reinstatement prior to the two years [the period of the initially agreed leave of absence] having expired, WPIX would have complied with the contract and given him back his job." Fourth, although WPIX may well have to reinstate Tomaselli and provide him with back pay as a result of the pending litigation, no significant hardship would result from holding WPIX to contractual provisions in which it has voluntarily acquiesced since 1971, especially when contrasted with the hardship that would be imposed upon Tomaselli if, contrary to his legitimate expectations, he were not reinstated. Fifth, there is a statutory interest in applying the new rule retroactively. The Board's decision in this case noted that seventy-six percent of a recent sample of union contracts contained union-related leave of absence provisions, and that "tremendous instability in labor relations ... would result if we deemed all union-related leave of absence provisions unlawful." *Radio and Television Broadcast Eng'rs Union Local 1212*, 288 N.L.R.B. No. 49 at 10 n. 15 (Apr. 1, 1988).

Conclusion

The petition for review is denied.