909 F.2d 963
 135 L.R.R.M. (BNA) 2107, 116 Lab.Cas. P 10,232
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MANITOWOC ENGINEERING CO. and Clipper City Lodge No. 516,
District 10, International Association of
Machinists and Aerospace Workers,
AFL-CIO, Respondents.
 No. 89-2623.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 29, 1990.
Decided Aug. 2, 1990.
 
 William A. Baudler, Linda J. Dreeben, N.L.R.B., Appellate Court--Enforcement Litigation, Aileen A. Armstrong, Steven B. Goldstein, N.L.R.B., Washington, D.C., Joseph A. Szabo, N.L.R.B., Milwaukee, Wis., and Donald J. Crawford, N.L.R.B., Region 13, Chicago, Ill., for petitioner.
 Clifford B. Buelow, Davis & Kuelthau and Matthew R. Robbins, Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, Milwaukee, Wis., for respondents.
 Before BAUER, Chief Judge, and FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 The National Labor Relations Board (Board) petitions the Court pursuant to section 10(e) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 160(e), requesting that we enforce its November 30, 1988 order holding Clipper City Lodge No. 516 (Union) primarily liable and Manitowoc Engineering Co. (Company) secondarily liable for violating sections 8(b)(1)(A) and 8(b)(2), and 8(a)(1) and 8(a)(3), respectively, of the NLRA. Whether we do so depends principally on our answer to the following question: Can it reasonably be said that the above mentioned sections of the NLRA were violated by the Union's and Company's maintenance and application of the Union-Company collective bargaining agreement (CBA) Article V, Sec. 17, which requires unit employees promoted to supervisor status to maintain union membership (or obtain a withdrawal card) in order to preserve their right to return to work in the bargaining unit with the seniority that accrued during their tenure as unit employees? The Board concluded that the NLRA was violated by the Union's and Company's maintenance and application of Article V, Sec. 17. See 291 NLRB 122. We find the Board's conclusion "to be based upon a reasonably defensible construction of the [NLRA]." NLRB v. Bufco Corp., 899 F.2d 608, 611 (7th Cir.1990). See also Pattern Makers' League v. NLRB, 473 U.S. 95, 100, 105 S.Ct. 3064, 3068, 87 L.Ed.2d 68 (1985) (the proper question for a reviewing court is whether the Board's construction of the NLRA is reasonable). Thus, our answer to the question previously posed is, "Yes." We will enforce the Board's order.
 
 I.
 
 2
 Article V, Sec. 17 of the CBA is titled "RETURN TO BARGAINING UNIT--SENIORITY." As the title indicates, it deals with questions of seniority and employment for employees who once worked in the bargaining unit but were transferred or promoted out and who now seek to return to the bargaining unit due to a retransfer or demotion. For these employees, the general gist of Article V, Sec. 17 is upbeat: "Employees ... who are transferred or promoted to positions outside the bargaining unit shall retain their accrued seniority." Moreover, these employees have a "right to return to the bargaining unit unless good cause is shown and provided." Article V, Sec. 17, then, seems to provide transferred or promoted employees contentment in knowing that their seniority and right to work in the bargaining unit will not be diminished by their transfer or promotion. Coupled with the CBA's Article V, Sec. 6, which, dealing with "TERMINATION OF SENIORITY," makes no mention of transferred or promoted employees, Article V, Sec. 17 undoubtedly communicates a comforting message.
 
 
 3
 But Article V, Sec. 17 contains a fly in the ointment. Buried away in the third paragraph of the provision lies a sentence stating that transferred or promoted employees "shall maintain membership in the Union or obtain a withdrawal card in accord with the provision of the Union's Constitution." Thus, the apparent gift of seniority security is made conditional: transferred or promoted employees must earn it. The seniority employees have accumulated throughout their many years of labor in the bargaining unit may, in a wink, disappear, unless when transferred or promoted they either maintain membership or obtain withdrawal. Obtaining withdrawal is easy: the relevant provision of the Union Constitution allows a withdrawal card to issue upon submission of an application, the payment of a minimal fee, and the payment of any overdue financial obligations. But obtaining withdrawal is far from certain; the Constitution states that a withdrawal card "may" issue upon the satisfaction of the above mentioned conditions, not that it "shall" issue. The alternative, maintaining membership, likewise is easy: political fervor is not required, only the satisfaction of "financial core" obligations. See Pattern Makers' League v. NLRB, 473 U.S. 95, 106 n. 16, 105 S.Ct. 3064, 3071 n. 16, 87 L.Ed.2d 68 (1985); NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963). It is not inexpensive, however; at the very least the payment of dues is required. See Pattern Makers' League, supra; General Motors Corp., supra.
 
 
 4
 In 1972 Eugene Ruppelt faced Article V, Sec. 17 for the first time. Thirty years before, in 1942, Ruppelt had started work at the Company in a unit represented by the Union. In 1972 Ruppelt was promoted to supervisor. This turn of affairs concerned Ruppelt. The promotion was nice, but he was worried about his seniority. Ruppelt had accrued thirty years that all but guaranteed him a job in the bargaining unit; he did not want to accept the promotion, throw those thirty years away, and later find himself demoted and unemployed. Ruppelt sought to alleviate his fears first through the mechanism of Article V, Sec. 17. Upon his promotion, he applied for a withdrawal card. He met the minimal conditions imposed on applicants, yet from the Union no card was forthcoming. Ruppelt's request was blocked by a shop committee chairman, a man miffed by Ruppelt's apparent lack of devotion to the Union and his apparent lack of respect for some of the Union brethren. Ruppelt then sought to alleviate his fears through management. About the quandary created by his lack of a withdrawal card Ruppelt talked to Company officials, who apparently convinced him he had nothing to worry about. Without the withdrawal card, Ruppelt took the promotion. He then quit the Union.
 
 
 5
 Ruppelt lived the supervisor's life for 14 years without event. In January of 1986, however, the day of reckoning came. Around January 3, 1986, Ruppelt was demoted back to the bargaining unit. For the past 14 years, however, the Company had listed Ruppelt's thirty years accrued seniority on a Union-Company "seniority list," and this without complaint from the Union, so the Company demoted him with his thirty years accrued seniority. As Ruppelt had anticipated, the seniority came in handy. At the time of his demotion, several unit employees with less seniority were on lay-off. If Ruppelt's seniority was taken away he too would be unemployed.
 
 
 6
 When the Union heard of Ruppelt's reemployment in the bargaining unit it immediately raised the hue and cry of unfair labor practice. The Union pointed out to the Company that Ruppelt did not comply with Article V, Sec. 17: he had not obtained a withdrawal card after his promotion, nor had he maintained Union membership (by paying dues). It claimed that Ruppelt forfeited his seniority and, as several employees with seniority were at that time on lay-off, that the Company had no right to employ Ruppelt in the bargaining unit. The Company found itself persuaded by the Union: on January 14 Ruppelt was laid off. Ruppelt, however, was not persuaded. Indignant about the unjustness of his present unemployed position, Ruppelt took his case to the Company's chairman. The chairman imbibed Ruppelt's point of view and shortly thereafter, on April 11, 1986, the Company changed its decision and returned Ruppelt to work in the bargaining unit.
 
 
 7
 The Union again raised the hue and cry on the issue of Ruppelt. At this point, however, the Company's mood was less disposed towards appeasement. It refused to lay him off. Consequently, the Union filed a grievance. The grievance ultimately came before an arbitrator, who, on June 2, decided that under the "clear and unambiguous language" of Article V, Sec. 17 Ruppelt lost his bargaining unit seniority because he failed to pay dues after his promotion to supervisor. Faced with the arbitrator's decision and the Union's threat to strike over the issue, the Company found itself compelled to lay off Ruppelt. It did so on July 11, 1986.[1]
 
 
 8
 In the meantime the contumacious Ruppelt lodged an unfair labor practice charge with the Board. Filed June 24, 1986, the charge alleged that the Union's actions had violated the NLRA. On the basis of this charge (and events subsequent to June 24) the Board's General Counsel on December 10 issued a complaint against the Union alleging its violation of NLRA sections 8(b)(1)(A) and 8(b)(2). The Union also lodged an unfair labor practice charge with the Board. Filed December 4, the charge alleged that the Company's actions had violated the NLRA. As a result of this charge the Board's General Counsel on January 8, 1987 issued a complaint against the Company (later amended) alleging its violation of NLRA sections 8(a)(1) and 8(a)(3). The two cases subsequently were consolidated and on stipulated facts the consolidated case proceeded directly to the Board.
 
 II.
 
 9
 The Board concluded that both the Union and the Company violated the NLRA. Its conclusion followed naturally from its finding that Article V, Sec. 17 "is unlawful on its face." In the Board's view, that finding was compelled by the policy of the NLRA to "insulate employees' jobs from their organizational rights," Local 1384, United Automobile Workers v. NLRB, 756 F.2d 482, 487 (7th Cir.1985) (citing Radio Officers' Union v. NLRB, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954)), and, most directly, by the language of section 8(a)(3), which prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."[2] See 29 U.S.C. Sec. 158(a)(3).
 
 
 10
 In the Board's interpretation, Article V, Sec. 17 establishes how some employees, those returning to the bargaining unit after a hiatus caused by promotion or transfer, may "acquire" seniority rights and gainful employment in the bargaining unit. The provision allows returning employees to make this acquisition in two ways: (1) by obtaining a withdrawal card, or (2) by paying union dues when not otherwise required to do so. Upon return to the bargaining unit, those employees who made the requisite "acquisition" are more than likely put to work; those who did not are more than likely put to pasture. Consequently, the Board found that with respect to seniority and employment, Article V, Sec. 17 mandates disparate treatment with respect to employment for employees returned to the bargaining unit on the basis of whether or not those employees made the required acquisition. Moreover, the Board found that this disparate treatment encourages union membership in two ways. First, it encourages unit employees subsequently transferred or promoted out of the unit to remain union members (by paying dues) when they have no legal or contractual obligation to do so. Second, it encourages unit employees not yet transferred or promoted out of the unit to be more than "members" satisfying their "financial core" obligation. Because those leaving the unit obtain withdrawal cards only after the Union determines that they are "good" Union members, unit members are encouraged to be not just members, but members with verve.
 
 
 11
 Article V, Sec. 17 looked like a loser in the eyes of the Board: The provision apparently impinged upon the language of section 8(a)(3) by mandating disparate employment treatment of employees on the basis of actions that encouraged union membership. Further, as a mere "means by which the Union is allowed to collect dues from individuals it does not represent in exchange for permitting those individuals to retain seniority they have already earned," the provision was unjustified by any of the NLRA's policies. And lastly, the provision did not fall into the privileged categories set out in the provisos to section 8(a)(3). As a consequence, the Board had no choice but to conclude that Article V, Sec. 17 ran afoul of section 8(a)(3) of the NLRA. It followed from this, and from the facts previously summarized, that the Company violated NLRA sections 8(a)(1) and 8(a)(3) and the Union NLRA sections 8(b)(1)(A) and 8(b)(2).
 
 III.
 
 12
 On appeal, both the Union and the Company argue that the Board erred in finding Article V, Sec. 17 "unlawful on its face." The Company's argument relates not to the Board's interpretation of the NLRA, but to its interpretation of Article V, Sec. 17. The Company maintains that Article V, Sec. 17, properly interpreted, gives transferred or promoted unit employees "freedom of choice" in deciding what to do with their return rights because they can either pay dues, or obtain a withdrawal card. Freedom of choice comes into play, so claims the Company, because transferred or promoted employees are entitled to a withdrawal card merely by satisfying two conditions: the payment of a fee and the payment of overdue "financial core" obligations incurred while employed in the bargaining unit. Thus Article V, Sec. 17, properly interpreted, encourages no more from employees than that which legally may be encouraged: the satisfaction of financial core obligations incurred while a unit employee. See generally NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). In the Company's view the Board erred in interpreting Article V, Sec. 17 as giving the Union discretion to grant or withhold withdrawal cards at its fancy. The Company believes that the Union has no discretion in the matter and that the real unfair labor practice in this case was not the maintenance and application of an illegal Article V, Sec. 17, but the obstinate and illegal behavior on the part of the Union in denying Ruppelt his withdrawal card in 1972 and in fighting his return to the unit in 1986.
 
 
 13
 In its brief the Company reminds us that "[i]t has long been a rule of labor contract interpretation that ambiguous clauses in collective bargaining agreements should be interpreted in a manner which renders them lawful, if at all possible." It then asserts that the Board erred by not following this rule. The phrase in Article V, Sec. 17 that the Company finds ambiguous reads "shall ... obtain a withdrawal card in accord with the provision of the Union's Constitution." It is this phrase that the Company would like us to interpret as restricting the Union's discretion in issuing withdrawal cards.[3] As we see it, however, this phrase is not at all ambiguous. In the context of all that Article V, Sec. 17 says, the phrase tells transferred or promoted employees that they may secure their accrued seniority if they obtain a withdrawal card, the process for which is spelled out in the Union Constitution. According to the Union Constitution, an employee should submit an application, pay a minimal fee, and satisfy delinquent financial obligations if he wants a withdrawal card; then the Union may issue the card. May issue. We see no ambiguity in this. The word "may," the Union Constitution, and Article V, Sec. 17 are all clear. They mean exactly what the Board found them to mean: that the Union has "substantial discretion" in deciding whether to issue a withdrawal card.
 
 
 14
 The Company tries to deny this meaning by using sleight of hand in its argument. It first concedes that the Union Constitution's use of "the word 'may' was intended to make issuance of withdrawal cards nonmandatory." But it then argues the opposite, that the Union Constitution makes the issuance of withdrawal cards mandatory when two minimal conditions (the payment of a withdrawal fee and the payment of any outstanding dues) have been met. In so doing the Company takes us from its concession that the word "may" confers discretion on the Union to grant or withhold withdrawal cards to its conclusion that the word "may" removes from the Union all discretion after two minimal conditions have been satisfied. "May" turns into "shall."
 
 
 15
 We cannot transform "may" into "shall." "May" means what it says. The Union Constitution gives substantial discretion to the Union in granting or withholding a withdrawal card. By requiring a transferred or promoted employee to obtain a withdrawal card "in accord with the provision of the Union's Constitution," Article V, Sec. 17 thereby places the withdrawal card fate of employees at the discretion of the Union. Contrary to the Company's assertion, Article V, Sec. 17 affords the employees no "freedom of choice" between obtaining a withdrawal or maintaining membership. Thus, the Board's interpretation of Article V, Sec. 17 stands.[4]
 
 
 16
 The Union cares not how Article V, Sec. 17 is interpreted. Its concern is with the Board's construction of the NLRA. We find no fault with that construction. NLRA section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." See 29 U.S.C. Sec. 158(a)(3). And Article V, Sec. 17 seems to engender exactly that which section 8(a)(3) prohibits. Article V, Sec. 17 states, in so many words, that employees returning to the bargaining unit will have their employment treated in disparate ways, and that how one is treated depends entirely on whether or not one stayed in the Union or got a withdrawal card. Article V, Sec. 17 creates a distinction between employees on the basis of the actions they take post-transfer/promotion and pre-return.[5] The effects of this distinction--loss of seniority; loss of job security; loss of the chance to work--are then visited upon those tainted by Article V, Sec. 17 after their return to the bargaining unit.[6] Considering this, nothing seems more reasonable than the Board's conclusion that the distinction created by Article V, Sec. 17 results in disparate treatment--discrimination[7]--in regard to protected employment (and protected employees).
 
 
 17
 Equally reasonable is the Board's conclusion that the disparate treatment occasioned by Article V, Sec. 17 encourages employees to be members of the Union. By its plain words, Article V, Sec. 17 says as much: transferred or promoted employees "shall maintain membership in the Union" at a time when neither law nor contract compels their membership. See generally Radio Officers' Union v. NLRB, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). True, the alternative offered by Article V, Sec. 17--obtaining a withdrawal card--is a less direct encouragement, but due to the "political" nature of this process it is an encouragement nonetheless. If one's chances of getting a withdrawal card (and the benefits it brings) increase directly with increases in the degree with which one participates in union activities as a "good Union member," then one naturally is encouraged to be a "good" Union member. Participation in union activities and support and assistance of a union, of course, is "membership" as that term is used in section 8(a)(3). Radio Officers' Union, 347 U.S. at 40, 74 S.Ct. at 335; Local 1384, United Automobile Workers v. NLRB, 756 F.2d 482, 487 (7th Cir.1985). Article V, Sec. 17's withdrawal option therefore encourages Union membership, though not as blatantly as its "maintenance" option.[8]
 
 
 18
 In any case, the command of section 8(a)(3) seems breached; at the very least it is reasonable to think so. Only NLRA policy can save Article V, Sec. 17. Yet we, like the Board, find no policy ready to act the role of savior. The Union makes a few policy arguments. But they fail to persuade; they cannot transform Article V, Sec. 17's statutory breach into something lawful.[9] The only policy seemingly relevant, that of insulating employees' jobs from their organizational rights and allowing "employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood," Radio Officers' Union, 347 U.S. at 40, 74 S.Ct. at 335, bolsters, rather than undermines, the Board's decision.
 
 
 19
 Thus, ever mindful of our standard of review,[10] we feel compelled by statutory language and labor policy to uphold the Board's conclusion that Article V, Sec. 17 is unlawful on its face. Consequently, its maintenance and application by the Company and the Union resulted in violations of the NLRA.
 
 IV.
 
 20
 The principal issue having been decided, we take a few paragraphs to dispose of two other issues raised by the Union. The first concerns the statute of limitations. The Union argues that the Board's order is inefficacious because the suit upon which it is based arose outside the six-month statute of limitations imposed by NLRA section 10(b). Section 10(b) provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." See 29 U.S.C. Sec. 160(b). The Board construes section 10(b) to start the limitations clock from the date a final and unequivocal adverse employment decision is made and communicated to an employee. See Postal Service Marina Center, 271 NLRB 397 (1984). We construe section 10(b) in a similar fashion. See Esmark, Inc. v. NLRB, 887 F.2d 739, 745-46 (7th Cir.1989). In the Union's view, the requisite decision was made and communicated in 1972: it was then that Ruppelt was stripped of seniority. But we cannot agree. The section 10(b) clock started ticking in 1986, not 1972. In 1972 neither the Company nor the Union made a decision with regard to Ruppelt's employment (or the terms and conditions thereof), excepting the Company's decision to give Ruppelt a promotion. Granted, in 1972 the Union made a decision regarding Ruppelt's withdrawal card, but that decision concerned membership, not employment. Granted also, in 1972 Ruppelt himself made a decision to stop paying dues, thereby subjecting himself to problems in 1986. But Ruppelt's actions in 1972 cannot constitute the adverse employment decision. The decision must come from the Union or the Company, not from the (dis)affected employee, for it is the decision of the Union and Company that spawned the complaints.[11]
 
 
 21
 Simply put, the events of 1972 did not amount to "adverse employment decisions." Those decisions did not occur until 1986, when Ruppelt was resigned to reading the "Want" ads. It is from the dates of those decisions that the section 10(b) clock begins to tick. As the Board's order properly limited itself to unfair labor practices occurring within the period of time beginning six months prior to the filing of each unfair labor practice charge, section 10(b) cannot save the Union from the consequences of its decisions.[12]
 
 
 22
 The second issue we address only briefly. In concocting a remedy for the violations it found the Union and Company to have perpetrated, the Board made the Union and the Company jointly and severally liable "to make Ruppelt whole," but the Union primarily so. The Union finds this troublesome because, in effect, it will have to foot the remedial bill. It asks us to modify the Board's order, arguing that the norm in cases like this is to impose joint and several liability, without more, and that the Board had no reason to deviate from this norm. But this is the wrong argument. If one thing is settled in the area of labor relations it is that "the Board's power [to devise remedies] is a broad discretionary one," Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), that "the relation of remedy to policy is peculiarly a matter for administrative competence," Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941), that an order of the Board will not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA]." Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). See also G. Heileman Brewing Co. v. NLRB, 879 F.2d 1526, 1534 (7th Cir.1989); 29 U.S.C. Sec. 160(c). The Union has not endeavored to make such a showing, nor could it, for the Board's imposition of primary liability upon it (and the Board's imposition of secondary liability upon the Company) is a decision well grounded in the facts of the case and the policies of the NLRA.
 
 
 23
 The petition for enforcement is GRANTED.
 
 
 
 [1]
 Although the Company was compelled to lay off Ruppelt, it championed his cause in the ways open to it. On August 28, 1986, the Company filed suit in federal district court seeking to vacate the arbitrator's award. That suit later was held in abeyance pending the outcome of proceedings before the Board
 
 
 [2]
 The Board employed a three part test to determine whether section 8(a)(3) was violated. The test is as follows: The Board first determines whether the questioned contract clause causes employees to be treated differently with respect to an employment condition on the basis of union membership. If so, the Board then determines whether the different treatment encourages union activity. If so, the Board finally determines whether the different treatment is justified by the policies of the NLRA. If not, the clause is unlawful, along with the parties' maintenance and application of it. This three part test has received court approval. See WPIX, Inc. v. NLRB, 870 F.2d 858, 859, 865 (2d Cir.1989). As neither the Union nor the Company argue against its use, we assume its propriety
 
 
 [3]
 The Company seems to concede that if obtaining a withdrawal card is more a matter of politics than of meeting (legal) financial obligations, then Article V, Sec. 17 is illegal. Its point simply is that Article V, Sec. 17 does not allow the withdrawal card process to be politicized
 
 
 [4]
 The Company also argues that Article V, Sec. 17, as interpreted by the Board, conflicts with the greater principles of Article V, Sec. 6. This conflict cannot remain, argues the Company, thus Article V, Sec. 17 must be interpreted more favorably. We have read both section 6 and section 17. We discern no conflict. Granted, the two provisions do not constitute the apotheosis of harmony. But perfection in communication is rarely achieved when language is the medium, and, in any case, perfection is not required
 
 
 [5]
 Article V, Sec. 17 encourages employees to remain members (or obtain a withdrawal card) when they are not statutory employees, but rather, for example, when they are supervisors, who are unprotected by the NLRA. See NLRB v. Res-Care, Inc., 705 F.2d 1461, 1465 (7th Cir.1983). But when they remain members or obtain a card is irrelevant to section 8(a)(3). It is the timing of the disparate treatment regarding employment that is important--not the timing of the disparate treatment's cause--and in this case the disparate employment treatment does not occur until the affected individuals are statutory employees, ex-supervisors returned to the fold of the bargaining unit. It is only at that point that some employees work, and others walk
 
 
 [6]
 It is the effect of the distinction and its timing, among other things, that answers the question implied by the Union in its brief, that if an employer and union cannot violate the NLRA by requiring supervisors to be members in a union, how can the Company and Union violate it by requiring supervisors to be members in the Union if they want to work when demoted back to the bargaining unit? The short answer is that in the first instance supervisors have their jobs--their supervisory jobs--adversely affected when they violate company policy. In the second instance supervisory jobs are not affected; some supervisors are merely tainted by a distinction that affects them when they later become employees. In the first instance certain individuals experience discrimination only as supervisors. In the second certain individuals experience discrimination not as supervisors, but as employees. The first instance is lawful. The second may not be
 
 
 [7]
 No one contests the fact that the disparate treatment is discrimination, nor could they: "involuntary reduction of seniority, refusal to hire for an available job, and disparate wage treatment are clearly discriminatory." Radio Officers' Union, infra, 347 U.S. at 39, 74 S.Ct. at 335
 
 
 [8]
 That disparate treatment caused by a contract clause encourages union membership in fact normally is not enough to breach section 8(a)(3). The contract clause causing the disparate treatment must encourage union membership in intent as well. See Radio Officers' Union, supra, 347 U.S. at 42-44, 74 S.Ct. at 336-37; United Automobile Workers, supra, 756 F.2d at 487. "Improper intent need not be separately proved, however, when such encouragement ... is a natural consequence of the discriminatory action." United Automobile Workers, 756 F.2d at 487-88 (citing Radio Officers' Union, 347 U.S. at 45, 74 S.Ct. at 338). Apparently the Board found the encouragement wrought by Article V, Sec. 17 to follow naturally from its text, thereby negating the need to discern intent. Neither the Union nor the Company raise the issue, so we do not address it
 
 
 [9]
 The Union argues, in substance, that Article V, Sec. 17 is the result of collective bargaining, which should be encouraged, and as such Article V, Sec. 17 should not be disturbed. We agree that collective bargaining should be encouraged. But we do not agree that this encouragement should go so far as to insulate illegal contract provisions from remedial action. The Union also argues that persons such as Ruppelt are afforded a "substantial benefit" by Article V, Sec. 17's protection of seniority rights, a benefit amounting to unemployment insurance. Ruppelt's required membership in the Union is "merely payment for this undeniably valuable benefit." But if accrued seniority rights are reduced to unemployment insurance, why have seniority at all? Why not sell seniority to the highest bidder? Why not make everybody's accrued seniority, that of unit employees as well as promoted employees, contingent on an extra fee? Why not? Because the actions are illegal: they cause disparate treatment in employment rights and in so doing encourage union membership through the payment of fees. The Union argues further that persons such as Ruppelt benefit by the Union's hard work in negotiating improvements in wages, benefits, and working conditions during their absence from the unit. By requiring such persons to be Union members the Union is merely getting its due. But the set of non-Union persons who might benefit from the Union's work is larger than the set of persons in Ruppelt's situation: it includes all persons who might one day be Union members. Yet only those in Ruppelt's situation are required to pay dues. Most "potential" members buy in to the Union and all its hard work by paying a initiation fee when they first are employed. Ruppelt, and those like him, have already paid their initiation fee, and, in any case, the Union does not seek from them a fee, but rather dues. The Union's hard work might justify the imposition of a reinitiation fee on those in Ruppelt's situation, see NLRB v. International Union of Operating Eng'rs, Local 139, 425 F.2d 17 (7th Cir.1970); but cf. NLRB v. Office and Professional Employees Int'l Union, Local 2, 902 F.2d 1164 (4th Cir.1990), but the benefits from that hard work are not so great or so certain as to justify the imposition of dues. Finally the Union argues that it is only fair for Ruppelt (and those like him) to pay for his seniority. In the event of a lay off that returns him to the bargaining unit he will be entitled to preference over employees who have never been supervisors, but have always worked in the bargaining unit, and this is unfair. We think the opposite, however, for if Ruppelt has seniority it is clear that he worked in the unit for a longer time, and maintained his Union membership for a longer time, than those whom he replaces
 
 
 [10]
 Under normal circumstances we review a decision and order of the Board narrowly and with a good amount of deference, for we recognize that the Board has Congress's mandate to deal with problems of labor policy. See Pattern Makers' League v. NLRB, 473 U.S. 95, 116, 105 S.Ct. 3064, 3076, 87 L.Ed.2d 68 (1985) (White, J., concurring); United Automobile Workers, supra, 756 F.2d at 486. Thus, we review the Board's application of rules "for consistency with the Act and for rationality," nothing more; we review the Board's construction of the NLRA for a "reasonably defensible construction," but nothing more. See NLRB v. Bufco Corp., 899 F.2d 608, 611 (7th Cir.1990); David R. Webb, Inc. v. NLRB, 888 F.2d 501, 503, 505 (7th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990); United Automobile Workers, 756 F.2d at 486. That we might prefer another rule, or another construction, is not dispositive of our decision. See Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). If reasonable, the judgment of the Board must stand no matter what our predilections. See Pattern Makers' League, 473 U.S. at 114, 105 S.Ct. at 3075
 The Union argues, however, that our deference should be less and our review more exacting because the circumstances before us are not normal. It points out that the issue resolved by the Board below is hardly novel, having received the Board's attention in the past on at least four occasions. See Brown & Williamson Tobacco Co., 227 NLRB 2005 (1977); Steel Workers Local No. 1070, 171 NLRB 945 (1968); Kaiser Steel, 125 NLRB 1039 (1959); Namm's Inc., 102 NLRB 466 (1953). It also points out--and here lies the rub--that the Board's opinions are not consistent: the rule laid down by the Board in this case overruled that enunciated in Brown & Williamson, which overruled that in Kaiser Steel, which overruled that in Namm's Inc. The Board, to use the Union's phrase, has "a history of vacillation" on the subject. But vacillation on a point of law is not something unique to the Board. Even our highest Court occasionally is afflicted by the law's vicissitudes. Compare Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) with National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Nor is vacillation, by itself, cause to abandon deferential review. "An administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes." NLRB v. Local Union No. 103, International Ass'n of Bridge Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978) (emphasis added). See also NLRB v. J. Weingarten, Inc., 420 U.S. 251, 265-67, 95 S.Ct. 959, 967-68, 43 L.Ed.2d 171 (1975); United Automobile Workers, 756 F.2d at 492; Continental Web Press, Inc. v. NLRB, 742 F.2d 1087, 1093 (7th Cir.1984). But cf. Children's Habilitation Center, Inc. v. NLRB, 887 F.2d 130, 132 (7th Cir.1989) ("An administrative agency, like any other first-line tribunal, earns--or forfeits--deferential review by its performance."); Local 177, Democratic Union Organizing Committee, Seafarers Int'l Union v. NLRB, 603 F.2d 862 (D.C.Cir.1978), reh'g denied, 603 F.2d 891 (1979).
 It is true that our deference has limits. Board orders should not be enforced "where they ha[ve] 'no reasonable basis in law' either because the proper legal standard [is] not applied or because the Board applie[s] the correct standard but fail[s] to give the plain language of the standard its ordinary meaning." Ford Motor Co., 441 U.S. at 497, 99 S.Ct. at 1849. Nor should they be enforced where the Board's interpretation is " 'fundamentally inconsistent with the structure of the [NLRA]' and an attempt to usurp 'major policy decisions properly made by Congress.' " Id. But this is not to say that our deference is less than normal in such circumstances; it is merely to say that our deference can go only so far, i.e., only so far as experience and reason will allow.
 
 
 [11]
 Moreover, if the statute of limitations ran from the date an employee did something, benignly or otherwise, that a company later seizes on (or is forced to seize on) to make a decision adversely affecting the employee's employment, unfair labor practice suits might cease to exist. Companies simply would wait six months after the employee's act before rendering their adverse employment decision
 
 
 [12]
 We further note a facet of this case that the Union conveniently failed to address. The General Counsel's prosecution and the Board's decision were based, in part, on the maintenance by the Company and the Union of an illegal contract provision, and the application of that provision during January and July of 1986. Where a contract clause "is unlawful on its face, its maintenance and attempted enforcement during the six-month time period will provide the basis for an unfair labor practice charge." NLRB v. Local 1131, United Automobile Workers, 777 F.2d 1131, 1140 (6th Cir.1985). Regardless, then, of what happened in 1972, the existence and application in 1986 of Article V, Sec. 17 brings this suit within the time period of section 10(b)